**Baker & Hostetler, L.L.P.**
45 Rockefeller Plaza
New York, N.Y. 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Fernando A. Bohorquez, Jr.
Jonathan B. New
Keith R. Murphy
Geraldine E. Ponto
Kathryn M. Heim
*Attorneys for Irving H. Picard, Trustee of the*
*Substantively Consolidated SIPA Liquidation of*
*Bernard L. Madoff Investment Securities, L.L.C. and Bernard L. Madoff*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>        Plaintiff-Applicant,<br><br>v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES, L.L.C.,<br><br>        Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated)<br><br>**AMENDED COMPLAINT** |
| In re:<br><br>BERNARD L. MADOFF,<br><br>        Debtor. | |
| IRVING H. PICARD, Trustee of the Liquidation of Bernard L. Madoff Investment Securities, L.L.C.,<br><br>        Plaintiff,<br><br>v.<br><br>AMERICAN SECURITIES MANAGEMENT, L.P., formerly known as AMERICAN SECURITIES, L.P.;<br><br>PJ ASSOCIATES GROUP, L.P., doing business as PJ | Adv. Pro. No. 10-05415 (BRL) |

ADMINISTRATOR, L.L.C.;

PJ ASSOCIATES GROUP GP CORP.;

PJ ADMINISTRATOR, L.L.C., formerly known as PJ
ASSOCIATES GROUP, L.P.;

AMERICAN SECURITIES OPPORTUNITY FUND,
L.P.;

AMERICAN SECURITIES HOLDINGS
CORPORATION;

AMERICAN SECURITIES GROUP, L.L.C.;

AS HIROTA HOLDINGS CORP.;

CHARLES D. KLEIN, individually, as beneficial
owner of one or more IRAs, as custodian and/or trustee
of the Charles D. Klein Money Purchase Pension Plan,
as beneficiary of the Charles D. Klein Generation
Skipping Trust DTD 7/31/01, as custodian and/or
trustee of the Jane P. & Charles D. Klein Foundation
and as custodian and/or trustee of The Charles and Jane
Klein Family Fund;

DAVID P. STEINMANN, individually, as beneficial
owner of one or more IRAs, as custodian and/or trustee
of the David P. Steinmann Money Purchase Pension
Plan, as trustee of the Trust UAD 3/4/92 FBO
Benjamin R. Sigelman, as trustee of the Trust UAD
3/4/92 FBO Jonathan R. Sigelman and as custodian for
Catherine L. Steinmann;

NEIL B. GOLDSTEIN, individually, as beneficial
owner of one or more IRAs, as grantor of the Neil B.
Goldstein 2007 Trust and as beneficiary of the Jean
Weiner 1991 Grantor Retained Annuity Trust;

WALLACE APTMAN, individually and as beneficial
owner of one or more IRAs;

ABE MASTBAUM, individually, as custodian for
Jason Mastbaum and as beneficial owner of one or
more IRAs;

MICHAEL G. FISCH, individually, as beneficial owner
of one or more IRAs, as custodian and/or trustee of the

Michael G. Fisch Profit Sharing Plan and as trustee of the Michael G. Fisch 2006 Revocable Trust;

JOSEPH J. NICHOLSON, individually and as trustee of the Joseph J. Nicholson Charitable Remainder Unitrust;

ELIZABETH R. VARET, individually, as custodian for Joseph R. Varet, as custodian and/or trustee of the Elizabeth R. Varet Money Purchase Pension Plan, as grantor of the 2004 V Trust, as trustee and beneficiary of the Apollo Trust for Elizabeth R. Varet UAD 2/10/69, as trustee of the Apollo Trust 2/10/69 FBO Nina Rosenwald, as settlor of the Michael A. Varet Trust UAD 11/9/94, as settlor of the Trust 11/9/94 (A. Anagnos et al., trustees), as trustee of Issue 1 Trust UAD 8/30/41 FBO Nina Rosenwald, as trustee of Issue 1 Trust UAD 8/30/41 FBO Alice Rosenwald, as trustee and beneficiary of Issue 1 Trust UAD 8/30/41 FBO Elizabeth R. Varet, as trustee of Issue Trust 5 UAD 9/28/51 FBO Nina Rosenwald, as trustee of Issue Trust 5 UAD 9/28/51 FBO Alice Rosenwald, as trustee of Issue Trust 5 UAD 9/28/51 FBO Benjamin R. Sigelman, as trustee of Issue Trust 5 UAD 9/28/51 FBO Jonathan R. Sigelman, as trustee of Issue Trust 5 UAD 9/28/51 FBO David R. Varet, as beneficiary and trustee of Issue Trust 5 UAD 9/28/51 FBO Elizabeth R. Varet, as trustee of Issue Trust 5 UAD 9/28/51 FBO Joseph R. Varet, as trustee and beneficiary of Issue Trust 6 UAD 8/13/65 FBO Elizabeth R. Varet, as trustee of Issue Trust 6 UAD 8/13/65 FBO Alice Rosenwald, as trustee of Issue Trust 6 UAD 8/13/65 FBO Nina Rosenwald, as trustee of the Trust UAD 3/4/92 FBO Benjamin R. Sigelman and as trustee of the Trust UAD 3/4/92 FBO Jonathan R. Sigelman;

LAURENCE ACH, as trustee of the Jean Weiner 1991 Grantor Retained Annuity Trust;

ALEXANDER G. ANAGNOS, as trustee of the 2004 V Trust and as trustee of Trust 11/9/94 (A. Anagnos et al., trustees);

GEORGE ANAGNOS;

JOSEPHINE G. ANAGNOS;

STEVEN ANAGNOS;

MARIA ANAGNOS-PIERCE;

SOL APTMAN, as a joint tenant with right of survivorship with Beatrice Aptman;

EUGENE J. CANTY, JR.;

BELINDA CLARKE, as trustee for the Concorde 1987 Trust DTD 12/9/87;

STUART H. COLEMAN, as trustee of the Apollo Trust for Elizabeth R. Varet UAD 2/10/69, as trustee of the Apollo Trust 2/10/69 FBO Nina Rosenwald, as trustee of Issue 1 Trust UAD 8/30/41 FBO Nina Rosenwald, as trustee of Issue 1 Trust UAD 8/30/41 FBO Elizabeth R. Varet, as trustee of Issue 1 Trust UAD 8/30/41 FBO Alice Rosenwald, as trustee of Issue Trust 5 UAD 9/28/51 FBO Alice Rosenwald, as trustee of Issue Trust 5 UAD 9/28/51 FBO Nina Rosenwald, as trustee of Issue Trust 5 UAD 9/28/51 FBO Benjamin R. Sigelman, as trustee of Issue Trust 5 UAD 9/28/51 FBO Jonathan R. Sigelman, as trustee of Issue Trust 5 UAD 9/28/51 FBO David R. Varet, as trustee of Issue Trust 5 UAD 9/28/51 FBO Elizabeth R. Varet, as trustee of Issue Trust 6 UAD 8/13/65 FBO Elizabeth R. Varet, as trustee of Issue Trust 6 UAD 8/13/65 FBO Alice Rosenwald and as trustee of Issue Trust 6 UAD 8/13/65 FBO Nina Rosenwald;

JOYCE W. GOLDSTEIN, individually, as beneficial owner of an IRA and as trustee of the Neil B. Goldstein 2007 Trust;

ELLEN V. GREENSPAN, as trustee of the Trust 11/9/94 (A. Anagnos et al., trustees);

ANTHONY R. GRILLO, as trustee of the Joseph J. Nicholson Charitable Remainder Unitrust;

LAILA HAFNER, as beneficial owner of an IRA;

NAN M. HARMAN, as trustee of the Visalia Trust UAD 1/25/97;

REED L. HARMAN, as trustee of the Visalia Trust

UAD 1/25/97;

PAUL HOROWITZ, individually, as beneficial owner
of an IRA, as a custodian for Elizabeth Horowitz, Jared
Horowitz and Minor #1 and as Executor of the Estate of
Jodi F. Horowitz;

ELIZABETH HOROWITZ;

JARED HOROWITZ;

THE ESTATE OF JODI F. HOROWITZ;

MINOR #1;

ANDREW B. KLEIN, individually, as beneficial owner
of one or more IRAs, as trustee and beneficiary of the
Charles D. Klein Generation Skipping Trust DTD
7/31/01, as trustee of the Andrew Klein Trust DTD
12/27/97, as trustee of the Elizabeth Klein Trust DTD
12/27/97 and as grantor and trustee of the Andrew B.
Klein 1997 Trust DTD 5/15/97;

ELIZABETH KLEIN, individually, as trustee and
beneficiary of the Charles D. Klein Generation
Skipping Trust DTD 7/31/01 and as trustee and
beneficiary of the Elizabeth Klein Trust DTD 12/27/97;

JANE P. KLEIN, individually, as beneficial owner of
an IRA, as custodian for Andrew B. Klein and
Elizabeth Klein, as trustee of the Trust under will of
Donald W. Parsons FBO Jane P. Klein, as trustee of the
Elizabeth Klein Trust DTD 12/27/97, as trustee of the
Charles D. Klein Generation Skipping Trust DTD
7/31/01 and as trustee of the Andrew Klein 1997 Trust
DTD 5/15/97;

JUDY STEINBERG KOVLER;

JAMES R. LEDLEY, as trustee of Issue Trust 5 UAD
9/28/51 FBO Jonathan R. Sigelman and as trustee of
the Trust UAD 3/4/92 FBO Jonathan R. Sigelman;

BARRY F. MARGOLIUS, as trustee of the Joseph J.
Nicholson Charitable Remainder Unitrust;

JASON MASTBAUM;

PAMELA MURPHY;

PAUL ROBERT MURPHY;

BENJAMIN E. NICKOLL, as trustee of the Charles D. Klein Generation Skipping Trust DTD 7/31/01;

THE ESTATE OF MIRIAM FURST-OSTOW;

RACHEL OSTOW LUSTBADER, as Executrix of the Estate of Miriam Furst-Ostow;

PETER PEARMAN, as trustee for the Concorde 1987 Trust DTD 12/9/87;

ARLENE MARIE PETTINGILL;

LAURA M. ROBERSON-FISCH, as beneficial owner of an IRA, as participant in the Laura M. Roberson-Fisch Money Purchase Pension Plan and as a participant in the Laura M. Roberson-Fisch Profit Sharing Plan;

ALICE ROSENWALD, also known as ALICE R. SIGELMAN, individually, as custodian for Jonathan Sigelman, as custodian for Benjamin R. Sigelman, as trustee and beneficiary of Issue 1 Trust UAD 8/30/41 FBO Alice Rosenwald, as trustee and beneficiary of Issue Trust 6 UAD 8/13/65 FBO Alice Rosenwald, as trustee of the Apollo Trust for Elizabeth R. Varet UAD 2/10/69, as trustee of the Apollo Trust 2/10/69 FBO Nina Rosenwald, as trustee of Issue 1 Trust UAD 8/30/41 FBO Nina Rosenwald, as trustee of Issue 1 Trust UAD 8/30/41 FBO Elizabeth R. Varet, as trustee of Issue Trust 5 UAD 9/28/51 FBO Jonathan R. Sigelman, as trustee of Issue Trust 5 UAD 9/28/51 FBO David R. Varet, as trustee of Issue Trust 5 UAD 9/28/51 FBO Elizabeth R. Varet, as trustee of Issue Trust 5 UAD 9/28/51 FBO Sarah R. Varet, as trustee of Issue Trust 6 UAD 8/13/65 FBO Elizabeth R. Varet, as trustee of Issue Trust 6 UAD 8/13/65 FBO Nina Rosenwald and as Executrix of the Estate of Jesse L. Sigelman;

NINA ROSENWALD, individually, as trustee of the Apollo Trust for Elizabeth R. Varet UAD 2/10/69, as trustee of Issue 1 Trust UAD 8/30/41 FBO Alice Rosenwald, as trustee of Issue 1 Trust UAD 8/30/41 FBO Elizabeth R. Varet, as trustee of Issue Trust 5 UAD 9/28/51 FBO Benjamin R. Sigelman, as trustee of Issue Trust 6 UAD 8/13/65 FBO Elizabeth R. Varet, as trustee of Issue Trust 6 UAD 8/13/65 FBO Alice Rosenwald, as trustee of Issue Trust 5 UAD 9/28/51 FBO Alice Rosenwald, as trustee and beneficiary of the Apollo Trust 2/10/69 FBO Nina Rosenwald, as trustee and beneficiary of Issue 1 Trust UAD 8/30/41 FBO Nina Rosenwald, as trustee and beneficiary of Issue Trust 5 UAD 9/28/51 FBO Nina Rosenwald and as trustee and beneficiary of Issue Trust 6 UAD 8/13/65 FBO Nina Rosenwald;

IVO ROTHSCHILD;

JOSEPH A. ROSSETTI, as beneficial owner of an IRA;

BENJAMIN R. SIGELMAN, individually, as beneficiary of Issue Trust 5 UAD 9/28/51 FBO Benjamin R. Sigelman and as beneficiary of the Trust UAD 3/4/92 FBO Benjamin R. Sigelman;

JONATHAN R. SIGELMAN, individually, as beneficiary of Issue Trust 5 UAD 9/28/51 FBO Jonathan R. Sigelman and as beneficiary of the Trust UAD 3/4/92 FBO Jonathan R. Sigelman;

THE ESTATE OF JESSE L. SIGELMAN;

RONALD J. STEIN, as trustee of the Trust UAD 3/4/92 FBO Benjamin R. Sigelman and as trustee of the Trust UAD 3/4/92 FBO Jonathan R. Sigelman;

CATHERINE L. STEINMANN;

GABRIEL B. STEINMANN;

JOSHUA STEINMANN;

JENNIFER E. STEINMANN;

DAVID R. VARET;

JOSEPH R. VARET, individually, as beneficiary and as trustee of the Issue Trust 5 UAD 9/28/51 FBO Joseph R. Varet;

MICHAEL A. VARET, individually, as beneficial owner of one or more IRAs, as custodian for David R. Varet and Sara R. Varet and as trustee of the Michael A. Varet Trust UAD 11/9/94;

SARAH R. VARET, individually, as trustee and as beneficiary of Issue Trust 5 UAD 9/28/51 FBO Sarah R. Varet;

I. MICHAEL WOLFE, individually and as beneficial owner of an IRA;

SUSAN C. WOLFE, individually, as beneficial owner of a Keogh Plan and as trustee of the Trust under will of Donald W. Parsons FBO Jane P. Klein;

ABE MASTBAUM IRA, IRA SEP and IRA ROLLOVER;

CHARLES D. KLEIN IRA ROLLOVER;

DAVID P. STEINMANN IRA ROLLOVER #1 and IRA ROLLOVER #2;

JODI F. HOROWITZ IRA;

PAUL HOROWITZ IRA and IRA ROLLOVER;

ELIZABETH R. VARET IRA ROLLOVER;

JANE P. KLEIN IRA;

JOYCE W. GOLDSTEIN IRA;

LAILA HAFNER IRA;

LAURA M. ROBERSON-FISCH IRA;

JOSEPH A. ROSSETTI IRA ROLLOVER;

MICHAEL A. VARET IRA ROLLOVER and IRA

ROLLOVER #2;

MICHAEL G. FISCH IRA;

NEIL B. GOLDSTEIN IRA ROLLOVER;

I. MICHAEL WOLFE IRA;

SUSAN C. WOLFE KEOGH PLAN;

WALLACE APTMAN IRA ROLLOVER;

CHARLES D. KLEIN MONEY PURCHASE
PENSION PLAN;

DAVID STEINMANN DEFINED BENEFIT PLAN;

DAVID P. STEINMANN MONEY PURCHASE
PENSION PLAN;

ELIZABETH R. VARET DEFINED BENEFIT PLAN
& TRUST;

ELIZABETH R. VARET MONEY PURCHASE
PENSION PLAN;

LAURA M. ROBERSON-FISCH MONEY
PURCHASE PENSION PLAN;

LAURA M. ROBERSON-FISCH PROFIT SHARING
PLAN;

MICHAEL G. FISCH PROFIT SHARING PLAN;

ASB, L.L.C.;

CDK PARTNERS;

KLEIN FAMILY HOLDINGS, L.L.C.;

DARMEL MANAGEMENT, L.L.C.;

DECIMAL INVESTMENTS, L.L.C.;

INTELLIGENT VOICE RESEARCH, L.L.C.;

JJG ENTERPRISES;

P&I PARTNERS;

PTOWN POOKIES, L.L.C.;

SOUTH LAKE, L.L.C.;

1185 PARK AVENUE FOUNDATION, INC.;

ALICE ROSENWALD FUND;

AMERICAN PHILANTHROPIC FOUNDATION;

ANCHORAGE CHARITABLE FUND;

HUDSON CHARITABLE FUND;

JJG FOUNDATION, INC.;

METROPOLITAN PHILANTHROPIC FUND, INC.;

THE ABSTRACTION FUND;

THE CHARLES AND JANE KLEIN FAMILY FUND;

THE REED L. HARMAN AND NAN M. HARMAN
FOUNDATION;

WILLIAM ROSENWALD FAMILY FUND, INC.;

Defendants.

# TABLE OF CONTENTS

**Page**

I.      NATURE OF PROCEEDING ................................................................................ 1

II.     JURISDICTION AND VENUE ........................................................................... 5

III.    DEFENDANTS .................................................................................................... 6

    A.      Overview ................................................................................................ 6

    B.      American Securities, PJ Associates Group, L.P. and PJ Administrator
        L.L.C. ................................................................................................... 10

    C.      American Securities Affiliates ............................................................ 14

    D.      American Securities Insiders ............................................................... 16

    E.      Other PJ Account Participants ............................................................ 23

        1.      Individuals .............................................................................. 23

        2.      Individual Retirement Accounts ............................................ 34

        3.      Pension and Profit Sharing Plans .......................................... 37

        4.      Entities ................................................................................... 39

        5.      Funds and Foundations .......................................................... 40

IV.     BACKGROUND, THE TRUSTEE AND STANDING .................................... 42

V.      THE PONZI SCHEME ...................................................................................... 47

VI.     AMERICAN SECURITIES CREATES PJ, A SHELL INVESTMENT
    VEHICLE, TO INVEST WITH BLMIS ......................................................... 50

    A.      The Close Relationship Between American Securities, Madoff and
        Sterling Equities Leads to the PJ Vehicle's Investments with BLMIS ............... 50

    B.      The American Securities Insiders' Sophisticated Roles In Managing,
        Tracking and/or Administering The PJ Vehicle ................................... 55

VII.    AMERICAN SECURITIES PURCHASED ONE-OF-A-KIND FRAUD
    INSURANCE FOR ITS MADOFF INVESTMENT ....................................... 58

VIII.   AMERICAN SECURITIES RESTRUCTURED THE PJ INVESTMENT
    VEHICLE IN AN EFFORT TO LIMIT ITS LIABILITY FOR
    RECOMMENDING BLMIS ............................................................................ 63

IX.     AMERICAN SECURITIES INSIDERS WERE ON NOTICE OF NUMEROUS
    INDICIA OF FRAUD AT BLMIS ................................................................. 66

X.      AMERICAN SECURITIES INSIDERS' KNOWLEDGE AND/OR INQUIRY
    NOTICE MUST BE IMPUTED TO ALL DEFENDANTS ........................... 80

XI.     THE TRANSFERS ............................................................................................ 82

XII.    CUSTOMER CLAIM ....................................................................................... 85

-i-

# TABLE OF CONTENTS

(continued)

**Page**

COUNT ONE:  FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(A)(1)(A), 550(A), AND 551 ............................................................................................ 86

COUNT TWO:  FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(A)(1)(B), 550(A), AND 551 ............................................................................................ 87

COUNT THREE:  FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-A 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551 ........................................................................................ 88

COUNT FOUR:  FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW  §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551 ........................................................................................ 89

COUNT FIVE:  FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551 ............................................................................................ 90

COUNT SIX:  FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), AND 551 ............................................................................................ 91

COUNT SEVEN:  RECOVERY OF ALL FRAUDULENT TRANSFERS – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(G), 213(8) AND NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-A, 278, AND/OR 279, 11 U.S.C. §§ 544, 550(A), AND 551 ............................................................... 92

COUNT EIGHT:  RECOVERY OF SUBSEQUENT TRANSFERS – 11 U.S.C. §§ 550(A) AND 551 ................................................................................... 93

COUNT NINE:  DISALLOWANCE OF PJ LLC'S CUSTOMER CLAIM .............................. 94

Irving H. Picard (the "Trustee"), as trustee of the liquidation of the business of Bernard L.

Madoff Investment Securities, L.L.C. ("BLMIS") under the Securities Investor Protection Act,

15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"),[1] and the substantively consolidated estate of Bernard L.

Madoff ("Madoff") individually, by and through his undersigned counsel, for this amended

complaint (the "Amended Complaint"), states as follows:

## I.    NATURE OF PROCEEDING

1.    This adversary proceeding arises from the massive Ponzi scheme perpetrated by

Madoff.  Over the course of the scheme, there were more than 8,000 client accounts at BLMIS.

In early December 2008, BLMIS generated client account statements for its approximately 4,900

open client accounts.  When added together, these statements purport that clients of BLMIS had

approximately $65 billion invested with BLMIS.  In reality, BLMIS had assets on hand worth a

small fraction of that amount.  On March 12, 2009, Madoff admitted to the fraudulent scheme

and pleaded guilty to 11 felony counts, and was sentenced on June 29, 2009 to 150 years in

prison.

2.    The Defendants (defined below) named in this Amended Complaint received over

$91 million dollars of avoidable transfers from BLMIS beginning as early as January 2000.  For

more than a decade, Defendant American Securities Management, L.P., f/k/a American

Securities, L.P., f/k/a American Securities Holdings Corporation (individually and collectively,

"American Securities"), and certain of its senior officers, managers, directors, partners and

employees, directed investments to BLMIS through a BLMIS account in the name of PJ

Associates Group, L.P. ("PJ LP") and its successor, PJ Administrator, L.L.C. ("PJ LLC")

(collectively, the "PJ Vehicle").  Although, the PJ Vehicle was nominally a separate corporate

---

[1] For convenience, future reference to SIPA will not include "15 U.S.C."

entity, it was dominated and controlled by American Securities and, during various relevant times, dominated, controlled, and/or managed by Defendants Charles D. Klein ("Klein"), David P. Steinmann ("Steinmann"), Elizabeth R. Varet ("Varet"), Joseph Nicholson ("Nicholson") and Abe Mastbaum ("Mastbaum") (collectively, the "American Securities Insiders"). The PJ Vehicle's sole purpose was to funnel money that was provided by officers, managers, directors, and employees of American Securities and its affiliates, as well as by their families and close friends, into BLMIS.

3.    American Securities is a closely held money management firm and its officers, directors and managers are sophisticated investors with substantial experience with investments in securities, real estate and other complex financial instruments. Their sophistication and access to Madoff put them in a position to recognize and respond to numerous red flags that either did or should have put them on notice of fraudulent activity in connection with their accounts at BLMIS and/or that Madoff's business was predicated on fraud, including, but not limited to: (a) BLMIS's implausibly consistent returns; (b) BLMIS's inability to provide electronic real-time information to its investors; (c) BLMIS's failure to segregate assets; (d) BLMIS's lack of transparency; (e) Madoff's excessive desire to avoid regulatory scrutiny and his express refusal to Klein to manage the accounts of registered representatives; (f) BLMIS's execution of trades outside the daily trading range; (g) options volumes BLMIS reported to have engaged in on behalf of the PJ Vehicle exceeded the total number of S&P 100 Index options traded on the Chicago Board of Options Exchange ("CBOE"); (h) Madoff's ability to almost always trade at precisely the right time of day; (i) options transactions made on behalf of the PJ Vehicle settling in a time range outside of industry norms; (j) trades were executed on behalf of the PJ Vehicle when it had a negative cash balance with BLMIS; (k) the billions of dollars purportedly under

Madoff's management were audited by an accounting firm consisting of only two accountants, located in a strip mall; (l) BLMIS's fee structure was not consistent with industry norms and left billions of dollars on the table; and (m) financial industry press reports raised serious questions about Madoff's legitimacy. American Securities and American Securities Insiders did not conduct an inquiry into these and other red flags. Instead, American Securities and American Securities Insiders turned a blind eye to these indicia of fraud to continue to benefit themselves and the other individuals and entities who invested with BLMIS through the PJ Vehicle.

4.      Rather than conduct independent, meaningful and reasonable due diligence in response to red flags and to gain an understanding of Madoff's purported strategy and operations, American Securities and American Securities Insiders instead sought to limit their liability and to protect themselves against any losses should Madoff turn out to be a fraud or abscond with the funds invested through the PJ Vehicle's BLMIS accounts.

5.      In early 2000, despite Klein's belief that BLMIS was a "low-risk investment" that could be counted on to deliver "consistent, safe rates of return," American Securities hedged its bets by procuring a "one-of-a-kind insurance policy", referred to internally as the "Madoff Policy" and designed to, as described in various internal emails among American Securities' employees, "cover dishonest acts by Madoff" and protect "against fraud (theft-Ponzi schemes) . . . resulting from a Madoff bankruptcy." In other words, this "Madoff Policy," with a six-figure annual premium, was secured to insure against Madoff committing fraud – and even a Ponzi scheme - in connection with the PJ Vehicle's investments with BLMIS.

6.      Between 1996 and 2000, approximately $26,975,000 had been invested in the PJ Vehicle BLMIS account No. 1KW172. During that time the Defendants received consistently positive rates of return. In January 2000, certain American Securities Insiders sought to protect

3

the money invested through the PJ Vehicle by purchasing the Madoff Policy, which was written to cover the entire purported amount of money they had invested with BLMIS.  Indeed, certain American Securities Insiders continued to review and expand the policy over the next several years to ensure that every dollar invested in BLMIS was protected by their Ponzi insurance.

7.    Additionally, in or around July 2002, six years after opening the first PJ Vehicle account with BLMIS and a little over two years after purchasing the Madoff Policy, certain American Securities Insiders, including Steinmann and Varet, sought to limit the legal exposure of the PJ Vehicle, American Securities and any of their respective affiliates, partners, members, officers, directors, employees and authorized persons, and members of the family of William Rosenwald for facilitating investments with BLMIS by (among other things) forming a new investment vehicle to shield themselves from liability.  All of the money from the existing PJ account at BLMIS was transferred to an account in the name of this new vehicle—PJ Administrator, L.L.C.  At that time, each individual or entity that invested in the PJ Vehicle was required to sign an Account Administration Agreement that substantially limited any past and future liability to the PJ Account Participants (defined below) relating to the BLMIS investment.

8.    The PJ Vehicle, and advisers such as Klein, Steinmann, Mastbaum, Goldstein and Varet, knew that the information they relied upon when investing with BLMIS was insufficient for them to understand how Madoff was purportedly investing their money to achieve such consistently positive returns.  Even though they knew of numerous red flags indicating possible fraud at BLMIS, rather than reasonably investigate, they turned a blind eye, purchased insurance, limited their liability to Account Participants, and continued to invest millions of dollars with BLMIS.

9.       The purpose of this proceeding is to avoid and recover the avoidable transfers of BLMIS funds received directly or indirectly by the Defendants since January 2000, when the American Securities Insiders were on inquiry notice that BLMIS was engaged in possibly fraudulent activity.    Between January 2000 and December 2008, the Defendants received $91,896,296 of BLMIS funds, $10,102,453 of which was fictitious profits.   The Trustee seeks to set aside such transfers and recover the property for the benefit of the victims of Madoff's fraud.

## II.    **JURISDICTION AND VENUE**

10.       This adversary proceeding is brought pursuant to 15 U.S.C. §§ 78fff(b), 78fff-1(a) and 78fff-2(c)(3), §§ 502(d), 544, 548(a), 550(a) and 551 of Title 11 of the United States Code (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (New York Debtor & Creditor Law § 270 *et seq.* (McKinney 2001) ("DCL")) N.Y. C.P.L.R. 203(g), 213(8) and other applicable law, for avoidance and recovery of fraudulent conveyances and the disallowance of claim in connection with certain transfers of property by BLMIS to or for the benefit of defendants.   The Trustee seeks to avoid such transfers and preserve and recover the property for the benefit of BLMIS's defrauded customers.

11.       This is an adversary proceeding commenced before the same Court in which the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is pending. The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities, L.L.C. et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has been referred to this Court.   This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A) and (b)(4).

12.       This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O).

13.       Venue in this district is proper under 28 U.S.C. § 1409.

14.     This Court has personal jurisdiction over the defendants under N.Y. C.P.L.R. 302 and Bankruptcy Rule 7004.  The defendants have maintained minimum contacts with New York and/or the United States in connection with the claims alleged herein.  The defendants received avoidable and recoverable transfers from BLMIS and/or from the PJ Vehicle.  The defendants have repeatedly and purposefully availed themselves of the benefits of conducting business in New York and/or the United States by, among other things, investing directly, or through the PJ Vehicle, with BLMIS.

## III.   DEFENDANTS

### A.   Overview

15.     Defendant American Securities originated as a closely held money management firm that managed the assets of the members of the William Rosenwald family, heirs to the Sears Roebuck & Company fortune.   Members of the William Rosenwald family include Nina Rosenwald, Joseph R. Varet, Alice Rosenwald, Elizabeth R. Varet, Sarah R. Varet, Jonathan R. Sigelman, Michael A. Varet, David A. Varet and Benjamin R. Sigelman (collectively, the "Rosenwald Family").

16.     In the late 1980s, American Securities transitioned from an office that invested almost exclusively for the Rosenwald Family into a closely held third-party money management firm.  In 1994, American Securities formalized its private equity investment activity to include non-Rosenwald Family investors.  Today, American Securities continues to invest on behalf of the Rosenwald Family.

17.     American Securities and its many subsidiaries and affiliates, were, and continue to be, overseen by various members of the Rosenwald Family and certain of their close personal advisers and associates, including Klein, Steinmann, Varet and Goldstein.  At all times, the Rosenwald Family continued to invest in American Securities' funds and take advantage of

6

investment opportunities available to associates of American Securities.  One such investment opportunity available to associates of American Securities was to invest with BLMIS through the PJ Vehicle.

18.     The PJ Vehicle was created and controlled by employees of Defendant American Securities Management as a pooled investment account vehicle to invest in BLMIS on behalf of certain American Securities investors ("PJ Account Participants").    American Securities exercised complete dominion over, and control of, the PJ Vehicle in dealing with BLMIS in order to financially benefit PJ Account Participants by transferring the PJ Account Participants' funds to or from the PJ Vehicle (the "PJ Participant Funds"), which in turn invested funds with or withdrew funds from BLMIS.

19.     More specifically, funds invested with BLMIS, through the PJ Vehicle, were combined into a BLMIS account conceived of and set up by American Securities Insiders Varet, Steinmann, Klein and Mastbaum.  That account was opened with BLMIS in the name of PJ LP.  Mastbaum was also initially responsible for reviewing each of the accounts within PJ LP and confirming with account participants the amount that each participant wished to invest in BLMIS through PJ LP.

20.     PJ LP's customer agreement with BLMIS was signed by Klein on behalf of PJ LP, with an address care of American Securities.

21.     Upon information and belief, the Rosenwald Family, American Securities, and their associates disregarded the corporate form ascribed to the PJ Vehicle such that the PJ Vehicle's primary business was to house American Securities' BLMIS investments.  The PJ Vehicle did not have any employees or a payroll.  Instead, American Securities Insiders, by virtue of their employment or association with American Securities, managed, tracked,

administered and controlled most tasks pertaining to investments made through the PJ Vehicle. For example, Steinmann, Varet, and American Securities' office manager, Olga Dimini, were responsible for ordering and approving wire transfers that were over $50,000 to and from the PJ bank account at JPMorgan Chase, through which BLMIS and PJ Participant transfers were made. Also, certain American Securities' employees, including Mastbaum, were responsible for the day-to-day supervision of the PJ Vehicle's investments with BLMIS and for providing accounting, recordkeeping, technical support and/or investment advisory functions for the PJ Vehicle. Upon information and belief, from approximately mid-2003 through 2008, Nicholson took over Mastbaum's role and was responsible for the supervision of the PJ Vehicle's investments.

22.    Although nominally Klein was the President, Mastbaum the Vice President and Steinmann the Secretary/Treasurer of PJ GP, none of these American Securities Insiders had defined responsibilities in those roles. Instead, the American Securities Insiders, together, performed all essential operations for the PJ Vehicle vis-à-vis their existing roles within American Securities.

23.    According to Klein and Steinmann, the PJ Vehicle did not hold its own corporate meetings or maintain separate corporate records. The PJ Vehicle did not have its own office space, address or telephone number. Instead, the PJ Vehicle shared an address with American Securities, whose employees completely dominated and controlled the PJ Vehicle. Every action taken by the PJ Vehicle was at the behest or direction of American Securities, one of its employees or an American Securities Insider.

24.    Upon information and belief, certain PJ Account Participants, including American Securities entities and affiliates, disregarded corporate formalities and bypassed the PJ Vehicle in

transacting with BLMIS. For example, certain PJ Account Participants sent funds directly to BLMIS ─ rather than through the PJ Vehicle's JPMorgan Chase bank account ─ to be added to the PJ Vehicle's pooled BLMIS accounts. For example, on or around December 2, 2004, Defendant American Securities Holdings Corp. bypassed PJ LLC by writing a $400,000 check directly to "Bernard Madoff Securities" to be deposited in the PJ Vehicle's BLMIS account No. 1KW387. Similarly, on or around February 6, 2008, Defendant American Securities Group wrote a check to "Bernard Madoff Securities" for $1 million to be deposited in the PJ Vehicle's BLMIS account No. 1KW387, and one day later, on or around February 7, 2008, Defendant AS Hirota Holdings Corp. wrote a check to "Bernard Madoff Securities" for $1.5 million to be deposited in the PJ Vehicle's BLMIS account No. 1KW387.

25.    The PJ Vehicle functioned as a mere alter ego of American Securities and the corporate veil cannot be maintained between the PJ Vehicle and American Securities.

26.    The PJ Vehicle held account numbers 1KW172 and 1KW387, (collectively, the "PJ Accounts") at BLMIS for the purposes of buying, selling and trading in stocks, bonds and other securities. From January 1, 2000 through December 11, 2008 (the "Filing Date"),[2] the PJ Vehicle received approximately $91,896,296 directly from BLMIS (the "Initial Transfers"). Of the Initial Transfers, $10,102,453 constituted fictitious profits from the Ponzi scheme, i.e., other people's money ("Fictitious Profits").

27.    The Initial Transfers from BLMIS to the PJ Vehicle are identified in Exhibit C. To the extent that the PJ Vehicle was so dominated by American Securities as to be a mere

_____

[2]Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding was commenced." 15 U.S.C. § 78*lll*(7)(B). Thus, even though the application for a protective decree was filed on December 15, 2008, the Filing Date in this action is December 11, 2008.

instrumentality of American Securities or operated for the benefit of American Securities, and not as a separate entity, the transfers from BLMIS to the PJ Vehicle are Initial Transfers to American Securities. The Initial Transfers referenced herein are avoidable and recoverable from the PJ Vehicle and/or American Securities ("Initial Transferee Defendants").[3]

28.    Based on the Trustee's investigation to date, many of the Initial Transfers during the more than eight years prior to the Filing Date were subsequently transferred to the PJ Account Participants (collectively, the "Subsequent Transfers").

29.    Based on the Trustee's investigation to date, Exhibit A is a list of the defendants who received Subsequent Transfers of the funds originating from BLMIS ("Subsequent Transferee Defendants"). Subsequent Transferees received, in the aggregate, at least $91,896,296, the amount of the Initial Transfers reflected in Exhibit C. The Subsequent Transfers referenced herein are recoverable from the Subsequent Transferee Defendants.

30.    The Initial Transferee Defendants (the PJ Vehicle, American Securities and American Securities Opportunity Fund, L.P.) and the Subsequent Transferee Defendants (certain related American Securities entities, the American Securities Insiders and the other PJ Account Participants), collectively, the "Defendants", are described in turn below.

## B.    American Securities, PJ Associates Group, L.P. and PJ Administrator L.L.C.

31.    **American Securities (American Securities Management, L.P., f/k/a American Securities, L.P., f/k/a American Securities Holdings Corporation)**: Upon information and belief, American Securities was founded as a family office in 1947 by William Rosenwald, an

---

[3] On or around January 11, 2000, American Securities Opportunity Fund L.P. ("ASOF") received a transfer of $2.3 million from BLMIS's account at JPMorgan Chase & Co., Account #XXXXXXXXXXXX1703 (the "BLMIS Bank Account"). These funds were transferred on or around the following day from ASOF to the account held by PJ LP at JPMorgan Chase. To the extent that ASOF is an initial transferee, it received an avoidable and recoverable transfer pursuant to 15 U.S.C. § 78fff-2(c)(3), Bankruptcy Code sections 544 and 550, and DCL sections 273-279 and N.Y. C.P.L.R. 203(g) and 213(8).

heir to the Sears Roebuck & Company fortune.  The Rosenwald Family Office (the "Rosenwald Family Office") invested almost exclusively for an association of Rosenwald family members and their associates.  In the late 1980's, the Rosenwald Family Office transitioned into a third-party money management firm.

32.      Upon information and belief, this third-party money management firm was named American Securities Holdings Corporation and was wholly owned by entities created by the Rosenwald Family.  Upon information and belief, American Securities Holdings Corporation was an indirect shareholder of American Securities BD Co., a broker-dealer corporation that dealt in risk arbitrage and third market trading and was wholly-owned by the Rosenwald Family, by way of American Securities, L.P.  Steinmann coordinated information flow between the Rosenwald Family and American Securities Holdings Corporation.  Varet was Chairman and Chief Executive Officer of American Securities Holdings Corp.  Nina Rosenwald was also a Chairman.

33.      Upon information and belief, American Securities Holdings Corporation was reorganized into American Securities, L.P., which was opened to non-Rosenwald family investors and capitalized on relationships developed by the Rosenwalds with other wealthy families, as well as select institutions.  American Securities, L.P. is an investment/merchant banking limited partnership formed in New York in 1994.  Upon information and belief, on or about January 22, 2009, American Securities, L.P. changed its name to American Securities Management, L.P.

34.      Upon information and belief, American Securities GP Corp. is the general partner of American Securities.  American Securities GP Corp. is a corporation that was formed on or around December 13, 1993, under the laws of the State of New York.  Its principal place of

business is located in New York, New York. Varet is the Chairman of the Board of Directors of American Securities GP Corp. Upon information and belief, Mastbaum was Chairman and the CEO of American Securities GP Corp.

35.    American Securities' principal place of business was located at 122 East 42nd St., Suite 2400, New York, New York 10168. Upon information and belief, American Securities' principal office is now located at 299 Park Avenue, 34th Floor, New York, New York 10171.

36.    According to its own marketing material, American Securities manages over $3 billion of discretionary assets on behalf of wealthy families and institutions. American Securities, including its many subsidiaries and affiliates, is a closely held business overseen by various members of the Rosenwald Family and certain close personal advisers, including Klein, Steinmann, Varet, Goldstein and Michael Fisch, also a PJ Account Participant.

37.    Upon information and belief, all of the general and limited partners of the PJ Vehicle transacted business through American Securities and/or authorized, directed and/or managed the PJ Accounts via American Securities. At all times relevant hereto, the PJ Vehicle was a customer of Madoff's investment advisory business unit (the "IA Business").

38.    Upon information and belief, American Securities is also a Subsequent Transferee Defendant that received Subsequent Transfers of funds originating from BLMIS.

39.    **PJ Associates Group, L.P. ("PJ LP")**: Upon information and belief, Defendant PJ LP was a limited partnership that was formed under the laws of the State of New York. Its principal place of business was also located at 122 East 42nd St., Suite 2400, New York, New York 10168.

40.    Upon information and belief, American Securities was the manager of PJ LP.

41.     The general partner of PJ LP was PJ Associates Group GP Corp. ("PJ GP").  The limited partners of PJ LP were, upon information and belief, investors with PJ LP.

42.     PJ LP, care of American Securities, opened PJ Account No. 1KW172 with BLMIS in September 1996.  Most, if not all, of the funds in PJ Account No. 1KW172 were transferred to a new BLMIS account (No. 1KW387) on July 1, 2003, held by PJ LLC, one of the entities comprising the PJ Vehicle.

43.     Upon information and belief, PJ LP is also a Subsequent Transferee Defendant that received Subsequent Transfers of funds originating from BLMIS.

44.     **PJ Administrator, L.L.C. ("PJ LLC")**: Upon information and belief, Defendant PJ LLC is a limited liability company that was formed under the laws of the State of Delaware. Its principal place of business was located at 122 East 42nd Street, Suite 2400, New York, NY 10168.  However, upon information and belief, PJ LLC's principal office is now located at 299 Park Avenue, 34th Floor, New York, New York 10171.

45.     PJ LLC is the successor-in-interest to PJ LP.   At all times relevant hereto, Defendant PJ LLC was a customer of BLMIS.

46.     The sole member of PJ LLC is North Peak, L.L.C. ("North Peak").  North Peak is a limited liability company that was formed under the laws of the State of Delaware and is owned by American Securities.  Upon information and belief, American Securities exercised complete dominion over and control of North Peak.  Goldstein is the Manager of North Peak.

47.     PJ LLC is the accountholder for PJ Account No. 1KW387.

48.     At all relevant times, the PJ Vehicle, care of American Securities, held accounts with BLMIS.   Specifically, associates of American Securities, on behalf of the PJ Vehicle,

transferred funds to BLMIS's bank account at JPMorgan Chase in New York, New York, for application to the PJ Accounts for purposes of investing with BLMIS.

## C.    **American Securities Affiliates**

49.    **American Securities Opportunity Fund, L.P. ("ASOF"):** Upon information and belief, ASOF is a limited partnership that does business in New York, New York.

50.    ASOF's general partner is ASOF L.P., which is located at 299 Park Avenue, 34th Floor, New York, New York 10171, but formerly maintained its principal office at 122 East 42nd Street, New York, New York 10168.  ASOF GP Corp. is the general partner of ASOF L.P., both of which were formed on or around December 9, 1996.  Upon information and belief, Klein was the President of ASOF GP Corp. when it was formed.  As of 2006, Steinmann was the Vice President of ASOF GP Corp. and Varet was a director.  Steinmann became the President of ASOF GP Corp. in 2007.

51.    On or around January 11, 2000, ASOF received an Initial Transfer of $2.3 million from the BLMIS Bank Account and these funds were transferred on or around the following day from ASOF to the account held by PJ LP at JPMorgan Chase.

52.    **PJ Associates Group GP Corp. ("PJ GP"):** Upon information and belief, Subsequent Transferee Defendant PJ GP is a corporation that was formed under the laws of the State of New York.  Upon information and belief, its principal place of business was located at 666 3rd Ave., 29th Floor, New York, New York 10017.  However, upon information and belief, PJ GP's principal office is now located at 299 Park Avenue, 34th Floor, New York, New York 10171.

53.    As general partner of PJ LP, PJ GP had ultimate responsibility for the operation and management of the partnership.  Klein, Steinmann and Varet were, at various times,

directors of PJ GP.  Klein was its President, Mastbaum its Vice President and Steinmann its Secretary/Treasurer.

54.    **American Securities Group, L.L.C.**: Upon information and belief, Subsequent Transferee Defendant American Securities Group, L.L.C. is a limited liability company that was formed under the laws of the State of New York.  Its principal place of business was located at 666 3rd Ave., Suite 2800, New York, New York, 10017.  However, upon information and belief, American Securities Group, L.L.C.'s principal office is now located at 299 Park Avenue, 34th Floor, New York, New York 10171.  The managing members of American Securities Group, L.L.C. are Varet and Steinmann.

55.    Upon information and belief, American Securities Group, L.L.C., formerly known as WRFA Group, LLC, was formed in or around 2005 and took on the role of the Rosenwald Family Office in or around 2007 or 2008.   American Securities Group, L.L.C. handles accounting and administrative services as well as private investing for the Rosenwald Family's organizations, including American Securities.

56.    American Securities Group, L.L.C. has a number of affiliates including American Securities L.L.C.

57.    Upon information and belief, American Securities Group, L.L.C. received Subsequent Transfers of funds originating from BLMIS.

58.    **AS Hirota Holdings Corp.**: Upon information and belief, Subsequent Transferee Defendant AS Hirota Holdings Corp. is a corporation that was formed under the laws of the State of Delaware.  Upon information and belief, its principal place of business is located in New York, New York.  Varet is Chairman and President of AS Hirota Holdings Corp.  Steinmann is

Secretary and Treasurer of AS Hirota Holdings Corp.  Alice Rosenwald and Nina Rosenwald are also officers and/or directors of AS Hirota Holdings Corp.

59.    Upon information and belief, AS Hirota Holdings Corp. received Subsequent Transfers of funds originating from BLMIS.

### D.    American Securities Insiders

60.    **Charles D. Klein**: Upon information and belief, Subsequent Transferee Defendant Klein maintains his residence in South Kent, Connecticut.

61.    According to his testimony and public biography, Klein served as senior investment adviser to the Rosenwald Family from 1978 to 2002 and as a managing director of American Securities since 1994.   In those capacities, Klein recommended investments in securities, real estate and other investment vehicles to generate profits for the Rosenwald Family, American Securities, himself, his family, his colleagues and other investors.    Klein recommended to the Rosenwald Family and, upon information and belief, various affiliates and associates of American Securities, that they invest with BLMIS through the PJ Vehicle.

62.    Klein personally supervised and conducted due diligence for certain American Securities investments, including the American Securities investments with BLMIS.

63.    Klein was the President and director of PJ GP, a signatory and President of ASOF GP Corp, the general partner of ASOF, L.P., which was the general partner of ASOF, and a member of the investment committee for Sterling American Property, Inc. ("SAP").

64.    Klein is named as a Subsequent Transferee Defendant in this action in his individual capacity, as beneficial owner of one or more IRAs, as custodian and/or trustee of the Charles D. Klein Money Purchase Pension Plan, as a beneficiary of the Charles D. Klein Generation Skipping Trust dated ("DTD") 7/31/01 (the "Charles D. Klein Generation Skipping

Trust"), as custodian and/or trustee of the Jane P. & Charles D. Klein Foundation and as custodian and/or trustee of Defendant The Charles and Jane Klein Family Fund.

65.    Klein is a manager of Defendant Klein Family Holdings, L.L.C.

66.    Upon information and belief, Klein is an employee, member, manager, managing member, officer and/or director of the PJ Vehicle and/or American Securities.

67.    **David P. Steinmann**: Upon information and belief, Subsequent Transferee Defendant Steinmann maintains his residence in New York, New York.

68.    Steinmann has testified that he began working for the Rosenwald Family Office in 1976 as a senior administrator and he later transitioned to a managing director of American Securities.  Steinmann worked for the Rosenwald Family and American Securities from 1976 to 2008.  During that time, Steinmann oversaw the Rosenwald Family Office, which handled all accounting functions for American Securities and the Rosenwald Family.  Steinmann reported investment performance regularly to the Rosenwald sisters—Elizabeth Varet, Alice Sigelman, and Nina Rosenwald.  Steinmann also provided advice on investments made on behalf of the Rosenwald Family and personally supervised certain American Securities investments, including the American Securities investments with BLMIS.  Steinmann was also a member of the investment committee for SAP.

69.    Steinmann was a director and Treasurer/Secretary of PJ GP.  Steinmann was also an authorized signatory for North Peak, L.L.C., the managing member of PJ LLC.

70.    Upon information and belief, Steinmann, among others, oversaw the PJ Vehicle investments with BLMIS.

71.    Steinmann is named as a Subsequent Transferee Defendant in this action in his individual capacity, as beneficial owner of one or more IRAs, as custodian and/or trustee of the

David P. Steinmann Money Purchase Pension Plan, as trustee of the Trust UAD 3/4/92 FBO

Benjamin R. Sigelman, as trustee of the Trust UAD 3/4/92 FBO Jonathan R. Sigelman and as

custodian for Catherine L. Steinmann.

72.     Steinmann is a director of Subsequent Transferee Defendant Abstraction Fund

and an officer of Subsequent Transferee Defendants AS Hirota Holdings Corp. and 1185 Park

Avenue Foundation, Inc.

73.     Upon information and belief, Steinmann is an employee, member, manager,

managing member, officer and/or director of the PJ Vehicle and/or American Securities.

74.     **Neil B. Goldstein**: Upon information and belief, Subsequent Transferee

Defendant Goldstein maintains his residence in Essex Fells, New Jersey.

75.     Upon information and belief, Goldstein was a managing director of American

Securities BD Co., L.P. and the Rosenwald Family Office.   As managing director of American

Securities BD Co., L.P., Goldstein directed the American Securities' arbitrage business and

invested American Securities funds to generate profits through private equity arbitrage.

76.     Goldstein has worked for American Securities or one of its affiliates for decades,

including as managing director of Pine Street, a capital management company.   Goldstein also

provided advice on investments made on behalf of the Rosenwald Family, including the

American Securities investments with BLMIS.

77.     Upon information and belief, since 1991, Goldstein has helped raise hundreds of

millions of dollars for investment with American Securities, primarily by attracting investors

from other wealthy families, as well as select institutions.

78.     Upon information and belief, Goldstein monitored the PJ Accounts, especially the

prices at which securities were purportedly bought and sold by BLMIS on behalf of the PJ

Vehicle. Goldstein was also the Manager of North Peak, the managing member of PJ LLC. Goldstein is also a manager of Subsequent Transferee Defendant South Lake, L.L.C.

79.    Goldstein is named as a Subsequent Transferee Defendant in this action in his individual capacity, as beneficial owner of one or more IRAs, as grantor of the Neil B. Goldstein 2007 Trust and as beneficiary of the Jean Weiner 1991 Grantor Retained Annuity Trust.

80.    Upon information and belief, Goldstein is an employee, member, manager, managing member, officer and/or director of the PJ Vehicle and/or American Securities.

81.    **Elizabeth R. Varet**: Upon information and belief, Subsequent Transferee Defendant Varet maintains her residence in New York, New York.

82.    Varet is a member of the Rosenwald Family and a managing director of American Securities. According to publicly available information, Varet has worked for American Securities since 1978, currently serves as the Chairman of the Board and actively participates in the operations of the company in that role. In her management capacity with American Securities, Varet recommends investments in securities, including the American Securities investments with BLMIS, real estate and other investments, to generate profits for herself, her family, her colleagues and other investors. Upon information and belief, when investments were made on behalf of the family-run foundations, such as defendant William Rosenwald Family Foundation, Varet represented the interests of her family at American Securities and was involved on a full-time basis in the business.

83.    Varet personally supervised certain American Securities investments, including as a member of the investment committee for SAP.

84.     As a director of American Securities, Varet supported Klein's recommendation for the Rosenwald Family and American Securities to make an initial investment with BLMIS through PJ LP.

85.     Varet was initially the sole director of PJ GP.  In that role, Varet appointed Klein and Steinmann as directors of PJ GP.

86.     Varet was the Chairman of American Securities Holdings Corp.

87.     Varet is named as a Subsequent Transferee Defendant in this action in her individual capacity, as custodian for Joseph R. Varet, as custodian and/or trustee of the Elizabeth R. Varet Money Purchase Pension Plan, as grantor of the 2004 V Trust, as trustee and beneficiary of the Apollo Trust for Elizabeth R. Varet UAD 2/10/69, as trustee of the Apollo Trust 2/10/69 FBO Nina Rosenwald, as settlor of the Michael A. Varet Trust UAD 11/9/94, as settlor of the Trust 11/9/94 (A. Anagnos et al., trustees), as trustee of Issue 1 Trust UAD 8/30/41 FBO Nina Rosenwald, as trustee of Issue 1 Trust UAD 8/30/41 FBO Alice Rosenwald, as trustee and beneficiary of Issue 1 Trust UAD 8/30/41 FBO Elizabeth R. Varet, as trustee of Issue Trust 5 UAD 9/28/51 FBO Nina Rosenwald, as trustee of Issue Trust 5 UAD 9/28/51 FBO Alice Rosenwald, as trustee of Issue Trust 5 UAD 9/28/51 FBO Benjamin R. Sigelman, as trustee of Issue Trust 5 UAD 9/28/51 FBO Jonathan R. Sigelman, as trustee of Issue Trust 5 UAD 9/28/51 FBO David R. Varet, as beneficiary and trustee of Issue Trust 5 UAD 9/28/51 FBO Elizabeth R. Varet, as trustee of Issue Trust 5 UAD 9/28/51 FBO Joseph R. Varet, as trustee and beneficiary of Issue Trust 6 UAD 8/13/65 FBO Elizabeth R. Varet, as trustee of Issue Trust 6 UAD 8/13/65 FBO Alice Rosenwald, as trustee of Issue Trust 6 UAD 8/13/65 FBO Nina Rosenwald, as trustee of the Trust UAD 3/4/92 FBO Benjamin R. Sigelman and as trustee of the Trust UAD 3/4/92 FBO Jonathan R. Sigelman.

88.     Varet is Chairman of the Board of Directors of American Securities GP Corp., a managing member of American Securities Group, L.L.C., Chairman and President of Subsequent Transferee Defendant AS Hirota Holdings Corp., a manager of Subsequent Transferee Defendant Decimal Investments, L.L.C., a director of Subsequent Transferee Defendant Anchorage Charitable Fund and a director of Subsequent Transferee Defendant William Rosenwald Family Fund, Inc.

89.     **Abe Mastbaum**: Upon information and belief, Subsequent Transferee Defendant Mastbaum maintains his residence in Marlboro, New Jersey.

90.     Mastbaum served as the Chief Financial Officer and Chief Compliance Officer of American Securities from 1994 to at least 2002.  In that capacity, Mastbaum dealt with regulators at the NASD and SEC, outside auditors, and investors.  Mastbaum was also involved with helping Goldstein run American Securities' arbitrage operations through American Securities BD Co., L.P.  In his role at American Securities, Mastbaum also provided advice regarding investment risks to Klein and other investment advisers with respect to potential investments to be made on behalf of American Securities and the Rosenwald Family.

91.     Mastbaum was Vice President of PJ GP and was also an authorized signatory for North Peak, the managing member of PJ LLC.

92.     Mastbaum was the Chairman and/or Chief Executive Officer of the following American Securities entities: American Securities Capital Partners GP Corp., American Securities GP Corp. and American Securities BD Co. GP Corp.

93.     Upon information and belief, at certain relevant times, Mastbaum directed and supervised the investments made by the PJ Vehicle with BLMIS.

21

94.    Mastbaum is named as a Subsequent Transferee Defendant in this action in his individual capacity, as custodian for Jason Mastbaum and as beneficial owner of one or more IRAs.

95.    Upon information and belief, Mastbaum is an employee, member, manager, managing member, officer and/or director of the PJ Vehicle and/or American Securities.

96.    **Joseph J. Nicholson**: Upon information and belief, Subsequent Transferee Defendant Nicholson maintains his residence in New York, New York.

97.    Nicholson was a software programmer for American Securities with, upon information and belief, expertise in accounting systems of financial institutions and family offices.  Upon information and belief, as early as 1996, Nicholson worked as a consultant to the Rosenwald Family Office and American Securities.  Upon information and belief, in 2002 or 2003, he worked as a consultant to or employee of American Securities, who reported to Steinmann, and provided administrative, technical, and supervisory support for various American Securities entities.  Nicholson participated in the creation of PJ LLC and unsuccessfully attempted to get BLMIS to establish an electronic feed for American Securities.

98.    Nicholson is named as a Subsequent Transferee Defendant in this action in his individual capacity and as trustee of the Joseph J. Nicholson Charitable Remainder Unitrust.

99.    Upon information and belief, Subsequent Transferee Defendant Nicholson owned and/or controlled Subsequent Transferee Defendants Intelligent Voice Research, L.L.C. and Ptown Pookies, L.L.C., which are companies that received transfers from the PJ Vehicle; upon information and belief, Nicholson benefited from the PJ Vehicle's transfers to these companies.

100.    Upon information and belief, Nicholson is an employee, member, manager, managing member, officer and/or director of the PJ Vehicle and/or American Securities.

E.     **Other PJ Account Participants**

1.     **Individuals**

101.     Upon information and belief, Subsequent Transferee Defendant Laurence Ach maintains his residence in New York, New York.  Laurence Ach is named as a Subsequent Transferee Defendant in this action in his capacity as trustee of the Jean Weiner 1991 Grantor Retained Annuity Trust.

102.     Upon information and belief, Subsequent Transferee Defendant Alexander G. Anagnos maintains his residence in Fort Lee, New Jersey.  Alexander G. Anagnos is named as a Subsequent Transferee Defendant in this action in his capacity as trustee of the Trust 11/9/94 and as trustee of the 2004 V Trust.

103.     Upon information and belief, Subsequent Transferee Defendant George Anagnos maintains his residence in Haworth, New Jersey.  George Anagnos is named as a Subsequent Transferee Defendant in this action in his individual capacity.

104.     Upon information and belief, Subsequent Transferee Defendant Josephine G. Anagnos maintains her residence in Fort Lee, New Jersey.  Josephine G. Anagnos is named as a Subsequent Transferee Defendant in this action in her individual capacity.

105.     Upon information and belief, Subsequent Transferee Defendant Steven Anagnos maintains his residence in Fort Lee, New Jersey.  Steven Anagnos is named as a Subsequent Transferee Defendant in this action in his individual capacity.

106.     Upon information and belief, Subsequent Transferee Defendant Maria Anagnos-Pierce maintains her residence in Hinsdale, Illinois.  Maria Anagnos-Pierce is named as a Subsequent Transferee Defendant in this action in her individual capacity.

107.     Upon information and belief, Subsequent Transferee Defendant Sol Aptman maintains his residence in Miami, Florida.  Sol Aptman is named as a Subsequent Transferee

23

Defendant in this action in his capacity as a joint tenant with right of survivorship with Beatrice Aptman.

108.    Upon information and belief, Subsequent Transferee Defendant Wallace Aptman maintains his residence in Jericho, New York.  Wallace Aptman is named as a Subsequent Transferee Defendant in this action in his individual capacity and in his capacity as beneficial owner of one or more IRAs.

109.    Upon information and belief, Subsequent Transferee Defendant Eugene J. Canty, Jr. maintains his residence in East Rockaway, New York.  Canty was an accountant for American Securities and the Rosenwald Family Office.  He also worked in administrative and coordinative capacities for various American Securities entities in the American Securities accounting department ("Back Office") and reported to Steinmann.  Canty worked with Nicholson, unsuccessfully, to get BLMIS to establish an electronic feed to American Securities.

110.    Canty is named as a Subsequent Transferee Defendant in this action in his individual capacity.  Upon information and belief, Canty is an employee, member, manager, managing member, officer and/or director of the PJ Vehicle and/or American Securities.

111.    Upon information and belief, Subsequent Transferee Defendant Belinda Clarke is employed at Conyers Dill & Pearman, located at Clarendon House, 2 Church Street, Hamilton HM CX, Bermuda.  Belinda Clarke is named as a Subsequent Transferee Defendant in this action in her capacity as trustee for the Concorde 1987 Trust DTD 12/9/87.

112.    Upon information and belief, Subsequent Transferee Defendant Stuart H. Coleman maintains his residence in New York, New York.  Stuart H. Coleman is named as a Subsequent Transferee Defendant in this action in his capacity as trustee of the Apollo Trust for Elizabeth R. Varet UAD 2/10/69, as trustee of the Apollo Trust 2/10/69 FBO Nina Rosenwald,

as trustee of Issue 1 Trust UAD 8/30/41 FBO Nina Rosenwald, as trustee of Issue 1 Trust UAD 8/30/41 FBO Elizabeth R. Varet, as trustee of Issue 1 Trust UAD 8/30/41 FBO Alice Rosenwald, as trustee of Issue Trust 5 UAD 9/28/51 FBO Alice Rosenwald, as trustee of Issue Trust 5 UAD 9/28/51 FBO Nina Rosenwald, as trustee of Issue Trust 5 UAD 9/28/51 FBO Benjamin R. Sigelman, as trustee of Issue Trust 5 UAD 9/28/51 FBO Jonathan R. Sigelman, as trustee of Issue Trust 5 UAD 9/28/51 FBO David R. Varet, as trustee of Issue Trust 5 UAD 9/28/51 FBO Elizabeth R. Varet, as trustee of Issue Trust 6 UAD 8/13/65 FBO Elizabeth R. Varet, as trustee of Issue Trust 6 UAD 8/13/65 FBO Alice Rosenwald, and as trustee of Issue Trust 6 UAD 8/13/65 FBO Nina Rosenwald.

113.    Upon information and belief, Subsequent Transferee Defendant Michael G. Fisch maintains his residence in New York, New York.  Fisch is named as a Subsequent Transferee Defendant in this action in his individual capacity, as beneficial owner of one or more IRAs, as custodian and/or trustee of the Michael G. Fisch Profit Sharing Plan and as trustee of the Michael G. Fisch 2006 Revocable Trust.

114.    Upon information and belief, Subsequent Transferee Defendant Joyce W. Goldstein maintains her residence in Essex Fells, New Jersey.  Joyce W. Goldstein is named as a Subsequent Transferee Defendant in this action in her individual capacity, as beneficial owner of an IRA and as a trustee of the Neil B. Goldstein 2007 Trust.

115.    Upon information and belief, Subsequent Transferee Defendant Ellen V. Greenspan maintains her residence in New York, New York.  Ellen V. Greenspan is named as a Subsequent Transferee Defendant in this action in her capacity as trustee of the Trust 11/9/94 (A. Anagnos et al., trustees).

25

116.    Upon information and belief, Subsequent Transferee Defendant Anthony R. Grillo maintains his residence in New Vernon, New Jersey.  Anthony R. Grillo is named as a Subsequent Transferee Defendant in this action in his capacity as trustee of the Joseph J. Nicholson Charitable Remainder Unitrust.

117.    Upon information and belief, Subsequent Transferee Defendant Laila Hafner maintains her residence in Naples, Florida.  Laila Hafner is named as a Subsequent Transferee Defendant in this action in her capacity as beneficial owner of an IRA.

118.    Upon information and belief, Subsequent Transferee Defendant Nan M. Harman maintains her residence in Palos Verdes Estates, California.  Nan M. Harman is named as a Subsequent Transferee Defendant in this action in her capacity as trustee of the Visalia Trust UAD 1/25/97.

119.    Upon information and belief, Subsequent Transferee Defendant Reed L. Harman maintains his residence in Palos Verdes Estates, California.  Reed L. Harman is named as a Subsequent Transferee Defendant in this action in his capacity as trustee of the Visalia Trust UAD 1/25/97.

120.    Upon information and belief, Subsequent Transferee Defendant Paul Horowitz maintains his residence in Riverside, Connecticut.  Paul Horowitz is named as a Subsequent Transferee Defendant in this action in his individual capacity, as beneficial owner of an IRA, as a custodian for Elizabeth Horowitz, Jared Horowitz, and Minor #1, and in his capacity as Executor of the Estate of Jodi F. Horowitz.

121.    Upon information and belief, Subsequent Transferee Defendant Elizabeth Horowitz maintains her residence in Riverside, Connecticut.  Elizabeth Horowitz is named as a Subsequent Transferee Defendant in this action in her individual capacity.

122.    Upon information and belief, Subsequent Transferee Defendant Jared Horowitz maintains his residence in Riverside, Connecticut.  Jared Horowitz is named as a Subsequent Transferee Defendant in this action in his individual capacity.

123.    Upon information and belied, Subsequent Transferee Defendant the Estate of Jodi F. Horowitz is named in this action to recover Subsequent Transfers received by Jodi F. Horowitz and/or her Estate.  Upon information and belief, Jodi F. Horowitz maintained her residence in Fairfield, Connecticut until her death in 2009.

124.    Upon information and belief, Subsequent Transferee Defendant Minor #1 maintains her residence in Riverside, Connecticut.   Minor #1 is named as a Subsequent Transferee Defendant in this action in his individual capacity.

125.    Upon information and belief, Subsequent Transferee Defendant Andrew B. Klein maintains his residence in New York, New York.  Andrew B. Klein is named as a Subsequent Transferee Defendant in this action in his individual capacity, as beneficial owner of one or more IRAs, as trustee and beneficiary of the Charles D. Klein Generation Skipping Trust, as trustee of the Andrew Klein Trust DTD 12/27/97, as trustee of the Elizabeth Klein Trust DTD 12/27/97 and as grantor and trustee of the Andrew B. Klein 1997 Trust DTD 5/15/97.

126.    Subsequent Transferee Defendant Andrew B. Klein is an officer and/or director of the Defendant The Charles and Jane Klein Family Fund.

127.    Upon information and belief, Subsequent Transferee Defendant Elizabeth Klein maintains her residence in Ludlow, Vermont.  Elizabeth Klein is named as a Subsequent Transferee in this action in her individual capacity, as trustee and beneficiary of the Charles D. Klein Generation Skipping Trust and as trustee and beneficiary of the Elizabeth Klein Trust DTD 12/27/97.

128.    Subsequent Transferee Defendant Elizabeth Klein is an officer and director of the Defendant The Charles and Jane Klein Family Fund.

129.    Upon information and belief, Subsequent Transferee Defendant Jane P. Klein maintains her residence in South Kent, Connecticut.  Jane P. Klein is named as a Subsequent Transferee Defendant in this action in her individual capacity, as beneficial owner of an IRA, as custodian for Andrew B. Klein and Elizabeth Klein, as trustee of the Trust under will of Donald W. Parsons FBO Jane P. Klein, as trustee of the Elizabeth Klein Trust DTD 12/27/97, as a trustee of the Charles D. Klein Generation Skipping Trust and as trustee of the Andrew Klein 1997 Trust DTD 5/15/97.  Jane P. Klein is a member of Defendant Klein Family Holdings, L.L.C.

130.    Subsequent Transferee Defendant Jane P. Klein is an officer and director of the Defendant The Charles and Jane Klein Family Fund.

131.    Upon information and belief, Subsequent Transferee Defendant Judy Steinberg Kovler maintains her residence in New York, New York.  Judy Steinberg Kovler is named as a Subsequent Transferee Defendant in this action in her individual capacity.

132.    Upon information and belief, Subsequent Transferee Defendant James R. Ledley maintains his residence in Mount Kisco, New York.  James R. Ledley is named as a Subsequent Transferee in this action as trustee of Issue Trust 5 UAD 9/28/51 FBO Jonathan R. Sigelman and as trustee of the Trust UAD 3/4/92 FBO Jonathan R. Sigelman.

133.    Upon information and belief, Subsequent Transferee Defendant Barry F. Margolius maintains his residence in New York, New York.  Barry F. Margolius is named as a Subsequent Transferee Defendant in this action as trustee of the Joseph J. Nicholson Charitable Remainder Unitrust.

28

134.    Upon information and belief, Subsequent Transferee Defendant Jason Mastbaum maintains his residence at Marlboro, New Jersey.  Jason Mastbaum is named as a Subsequent Transferee Defendant in this action in his individual capacity.

135.    Upon information and belief, Subsequent Transferee Defendant Pamela Murphy maintains her residence in Buenos Aires, Argentina.  Pamela Murphy is named as a Subsequent Transferee Defendant in this action in her individual capacity.

136.    Upon information and belief, Subsequent Transferee Defendant Paul Robert Murphy maintains his residence in Buenos Aires, Argentina.  Paul Robert Murphy is named as a Subsequent Transferee Defendant in this action in his individual capacity.

137.    Upon information and belief, Subsequent Transferee Defendant Benjamin E. Nickoll maintains his residence in New Preston Marble Dale, Connecticut.  Benjamin E. Nickoll is named as a Subsequent Transferee in this action in his capacity as trustee of the Charles D. Klein Generation Skipping Trust.

138.    Subsequent Transferee Defendant the Estate of Miriam Furst-Ostow is named as a Subsequent Transferee Defendant in this action to recover Subsequent Transfers received by Miriam Furst-Ostow individually and/or by her Estate.  Upon information and belief, Miriam Furst-Ostow maintained her residence in the Bronx, New York until her death in 2005.

139.    Upon information and belief, Subsequent Transferee Defendant Rachel Ostow Lustbader maintains her residence in New York, New York.  Rachel Ostow Lustbader is named as a Subsequent Transferee Defendant in this action in her capacity as the Executrix of the Estate of Miriam Furst-Ostow.

140.    Upon information and belief, Subsequent Transferee Defendant Peter Pearman is employed at Conyers Dill & Pearman, located at Clarendon House, 2 Church Street, Hamilton

HM CX, Bermuda.  Peter Pearman is named as a Subsequent Transferee Defendant in this action in his capacity as trustee for the Concorde 1987 Trust DTD 12/9/87.

141.    Upon information and belief, Subsequent Transferee Defendant Arlene Marie Pettingill, a/k/a Arlene Roberson, maintains her residence in Lakewood, Washington.  Arlene Marie Pettingill is named as a Subsequent Transferee Defendant in this action in her individual capacity.

142.    Upon information and belief, Subsequent Transferee Defendant Laura M. Roberson-Fisch maintains her residence in New York, New York.  Laura M. Roberson-Fisch is named as a Subsequent Transferee Defendant in this action in her capacity as beneficial owner of an IRA, as participant in the Laura M. Roberson-Fisch Money Purchase Pension Plan and as a participant in the Laura M. Roberson-Fisch Profit Sharing Plan.

143.    Upon information and belief, Subsequent Transferee Defendant Alice Rosenwald, a/k/a Alice R. Sigelman, maintains her residence in New York, New York.  Alice Rosenwald is named as a Subsequent Transferee Defendant in this action in her individual capacity, as custodian for Jonathan Sigelman, as custodian for Benjamin R. Sigelman, as trustee and beneficiary of Issue 1 Trust UAD 8/30/41 FBO Alice Rosenwald, as trustee and beneficiary of Issue Trust 6 UAD 8/13/65 FBO Alice Rosenwald, as trustee of the Apollo Trust for Elizabeth R. Varet UAD 2/10/69, as trustee of the Apollo Trust 2/10/69 FBO Nina Rosenwald, as trustee of Issue 1 Trust UAD 8/30/41 FBO Nina Rosenwald, as trustee of Issue 1 Trust UAD 8/30/41 FBO Elizabeth R. Varet, as trustee of Issue Trust 5 UAD 9/28/51 FBO Jonathan R. Sigelman, as trustee of Issue Trust 5 UAD 9/28/51 FBO David R. Varet, as trustee of Issue Trust 5 UAD 9/28/51 FBO Elizabeth R. Varet, as trustee of Issue Trust 5 UAD 9/28/51 FBO Sarah R. Varet,

as trustee of Issue Trust 6 UAD 8/13/65 FBO Elizabeth R. Varet, as trustee of Issue Trust 6 UAD

8/13/65 FBO Nina Rosenwald and as Executrix of the Estate of Jesse L. Sigelman.

144.    Subsequent Transferee Defendant Alice Rosenwald is President and director of

the Alice Rosenwald Foundation and a director of the Defendant William Rosenwald Family

Fund, Inc.

145.    Upon information and belief, Subsequent Transferee Defendant Nina Rosenwald

maintains her residence in New York, New York.  Nina Rosenwald is named as a Subsequent

Transferee Defendant in this action in her individual capacity, as trustee of  the Apollo Trust for

Elizabeth R. Varet UAD 2/10/69, as trustee of Issue 1 Trust UAD 8/30/41 FBO Alice

Rosenwald, the as trustee of Issue 1 Trust UAD 8/30/41 FBO Elizabeth R. Varet, as trustee of

Issue Trust 5 UAD 9/28/51 FBO Benjamin R. Sigelman, as trustee of Issue Trust 6 UAD 8/13/65

FBO Elizabeth R. Varet, as trustee of Issue Trust 6 UAD 8/13/65 FBO Alice Rosenwald, as

trustee of Issue Trust 5 UAD 9/28/51 FBO Alice Rosenwald, as trustee and beneficiary of the

Apollo Trust 2/10/69 FBO Nina Rosenwald, as trustee and beneficiary of Issue 1 Trust UAD

8/30/41 FBO Nina Rosenwald, as trustee and beneficiary of Issue Trust 5 UAD 9/28/51 FBO

Nina Rosenwald and as trustee and beneficiary of Issue Trust 6 UAD 8/13/65 FBO Nina

Rosenwald.

146.    Subsequent Transferee Defendant Nina Rosenwald is director of William

Rosenwald Family Fund, Inc.

147.    Upon information and belief, Subsequent Transferee Defendant Ivo Rothschild

maintains his residence in Montreal, Canada.   Ivo Rothschild is named as a Subsequent

Transferee Defendant in this action in his individual capacity.

148.    Upon information and belief, Subsequent Transferee Defendant Joseph A. Rossetti maintains his residence in New Smyrna Beach, Florida.  Joseph A. Rossetti is named as a Subsequent Transferee Defendant in this action in his capacity as beneficial owner of an IRA.

149.    Upon information and belief, Subsequent Transferee Defendant Benjamin R. Sigelman maintains his residence in New York, New York.  Benjamin R. Sigelman is named as a Subsequent Transferee Defendant in this action in his individual capacity, as beneficiary of Issue Trust 5 UAD 9/28/51 FBO Benjamin R. Sigelman and as beneficiary of the Trust UAD 3/4/92 FBO Benjamin R. Sigelman.

150.    Upon information and belief, Subsequent Transferee Defendant Jonathan R. Sigelman maintains his residence in Bronx, New York.  Defendant Jonathan R. Sigelman is named as a Subsequent Transferee Defendant in this action in his individual capacity, as a beneficiary of Issue Trust 5 UAD 9/28/51 FBO Jonathan R. Sigelman and as a beneficiary of the Trust UAD 3/4/92 FBO Jonathan R. Sigelman.

151.    Subsequent Transferee Defendant the Estate of Jesse L. Sigelman is named as a Subsequent Transferee Defendant in this action to recover Subsequent Transfers received by Jesse L. Sigelman and/or his Estate and in his capacity as custodian under the Uniform Gifts to Minors Act (UGMA) for Alice Sigelman, Benjamin R. Sigelman and Jonathan Sigelman.  Upon information and belief, Jesse L. Sigelman maintained his residence in New York, New York until his death in 2009.

152.    Upon information and belief, Subsequent Transferee Defendant Ronald J. Stein maintains his residence in Brooklyn, New York.  Ronald J. Stein is named as a Subsequent Transferee Defendant in this action as the trustee of the Trust UAD 3/4/92 FBO Benjamin R. Sigelman and as trustee of the Trust UAD 3/4/92 FBO Jonathan R. Sigelman.

153.    Upon information and belief, Subsequent Transferee Defendant Catherine L. Steinmann maintains her residence in New York, New York.  Catherine L. Steinmann is named as a Subsequent Transferee Defendant in this action in her individual capacity.

154.    Upon information and belief, Subsequent Transferee Defendant Gabriel B. Steinmann maintains his residence in Irvine, California.  Gabriel B. Steinmann is named as a Subsequent Transferee Defendant in this action in his individual capacity.

155.    Upon information and belief, Subsequent Transferee Defendant Joshua Steinmann maintains his residence in San Francisco, California.  Joshua Steinmann is named as a Subsequent Transferee Defendant in this action in his individual capacity.

156.    Upon information and belief, Subsequent Transferee Defendant Jennifer E. Steinmann maintains her residence in Irvine, California.  Jennifer E. Steinmann is named as a Subsequent Transferee Defendant in this action in her individual capacity.

157.    Upon information and belief, Subsequent Transferee Defendant David R. Varet maintains his residence in Tallahassee, Florida.  David R. Varet is named as a Subsequent Transferee Defendant in this action in his individual capacity.

158.    Upon information and belief, Subsequent Transferee Defendant Joseph R. Varet maintains his residence in New York, New York.  Joseph R. Varet is named as a Subsequent Transferee Defendant in this action in his individual capacity and in his capacity as beneficiary and trustee of Issue Trust 5 UAD 9/28/51 FBO Joseph R. Varet.

159.    Upon information and belief, Subsequent Transferee Defendant Michael A. Varet maintains his residence in New York, New York.  Michael A. Varet is named as a Subsequent Transferee Defendant in this action in his individual capacity, as beneficial owner of one or more

IRAs, as custodian for David R. Varet and Sara R. Varet, and as trustee of the Michael A. Varet Trust UAD 11/9/94.

160.    Upon information and belief, Subsequent Transferee Defendant Sarah R. Varet maintains her residence in New York, New York.  Sarah R. Varet is named as a Subsequent Transferee Defendant in this action in her individual capacity and as trustee and beneficiary of the Issue Trust 5 UAD 9/28/51 FBO Sarah R. Varet.

161.    Upon information and belief, Subsequent Transferee Defendant I. Michael Wolfe maintains his residence in Marshfield, Massachusetts.   I. Michael Wolfe is named as a Subsequent Transferee Defendant in this action in his individual capacity and as beneficial owner of an IRA

162.    Upon information and belief, Subsequent Transferee Defendant Susan C. Wolfe maintains her residence in Marshfield, Massachusetts.  Susan C. Wolfe is named as a Subsequent Transferee Defendant in this action in her individual capacity, as beneficial owner of a Keogh Plan and an IRA and as a trustee of the Trust under will of Donald W. Parsons FBO Jane P. Klein.

### 2.    Individual Retirement Accounts

163.    Upon information and belief, Subsequent Transferee Defendants Abe Mastbaum IRA, IRA SEP and IRA Rollover were established as investment retirement accounts with assets held by PJ LLC as custodian and Mastbaum as beneficial owner in New York, New York, approximate to where the custodian is located.

164.    Upon information and belief, Subsequent Transferee Defendant Charles D. Klein IRA Rollover was established as an investment retirement account with assets held by PJ LLC as custodian and Charles D. Klein as beneficial owner in New York, New York, approximate to where the custodian is located.

165.    Upon information and belief, Subsequent Transferee Defendants David P. Steinmann IRA Rollover #1 and IRA Rollover #2 were established as investment retirement accounts with assets held by PJ LLC as custodian and David P. Steinmann as beneficial owner in New York, New York, approximate to where the custodian is located.

166.    Upon information and belief, Subsequent Transferee Defendant Jodi F. Horowitz IRA was established as an investment retirement account with assets held by Delaware Charter, as custodian, and Jodi F. Horowitz as beneficial owner in Wilmington, Delaware approximate to where the custodian is located.

167.    Upon information and belief, Subsequent Transferee Defendant Paul Horowitz IRA and IRA Rollover were established as investment retirement accounts with assets held by Delaware Charter as custodian and Paul Horowitz as beneficial owner in Wilmington, Delaware, approximate to where the custodian is located.

168.    Upon information and belief, Subsequent Transferee Defendant Elizabeth R. Varet IRA Rollover was established as an investment retirement account with assets held by PJ LLC as custodian and Elizabeth R. Varet as beneficial owner in New York, New York, approximate to where the custodian is located.

169.    Upon information and belief, Subsequent Transferee Defendant Jane P. Klein IRA was established as an investment retirement account with assets held by PJ LLC as custodian and Jane P. Klein as beneficial owner in New York, New York, approximate to where the custodian is located.

170.    Upon information and belief, Subsequent Transferee Defendant Joyce W. Goldstein IRA was established as an investment retirement account with assets held by PJ LLC

as custodian and Joyce W. Goldstein as beneficial owner in New York, New York, approximate to where the custodian is located.

171.    Upon information and belief, Subsequent Transferee Defendant Laila Hafner IRA was established as an investment retirement account with assets held by PJ LLC as custodian, and Laila Hafner as beneficial owner in New York, New York, approximate to where the custodian is located.

172.    Upon information and belief, Subsequent Transferee Defendant Laura M. Roberson-Fisch IRA was established as an investment retirement account with assets held by PJ LLC as custodian and Laura M. Roberson-Fisch as beneficial owner in New York, New York, approximate to where the custodian is located.

173.    Upon information and belief, Subsequent Transferee Defendant Joseph A. Rossetti IRA Rollover was established as an investment retirement account with assets held by PJ LLC as custodian and Joseph A. Rossetti as beneficial owner in New York, New York, approximate to where the custodian is located.

174.    Upon information and belief, Subsequent Transferee Defendants Michael A. Varet IRA Rollover and IRA Rollover #2 were established as investment retirement accounts with assets held by PJ LLC as custodian and Michael A. Varet as beneficial owner in New York, New York, approximate to where the custodian is located.

175.    Upon information and belief, Subsequent Transferee Defendant Michael G. Fisch IRA was established as an investment retirement account with assets held by PJ LLC as custodian and Michael G. Fisch as beneficial owner in New York, New York, approximate to where the custodian is located.

176.    Upon information and belief, Subsequent Transferee Defendant Neil B. Goldstein IRA Rollover was established as an investment retirement account with assets held by PJ LLC as custodian and Goldstein as beneficial owner in New York, New York, approximate to where the custodian is located.

177.    Upon information and belief, Subsequent Transferee Defendant I. Michael Wolfe IRA was established as an investment retirement account with assets held by PJ LLC as custodian and I. Michael Wolfe as beneficial owner in New York, New York, approximate to where the custodian is located.

178.    Upon information and belief, Subsequent Transferee Defendant Susan C. Wolfe Keogh Plan was established as an investment retirement account with assets held by PJ LLC as custodian and Susan C. Wolfe as beneficial owner in New York, New York, approximate to where the custodian is located.

179.    Upon information and belief, Subsequent Transferee Defendant Wallace Aptman IRA Rollover was established as an investment retirement account with assets held by PJ LLC as custodian and Aptman as beneficial owner in New York, New York, approximate to where the custodian is located.

### 3.    Pension and Profit Sharing Plans

180.    Upon information and belief, Subsequent Transferee Defendant Charles D. Klein Money Purchase Pension Plan, was established as a pension plan and administered and sponsored by Klein as trustee of the plan in South Kent, Connecticut, approximate to where the trustee is located.

181.    Upon information and belief, Subsequent Transferee Defendant David Steinmann Defined Benefit Plan was established as a defined benefit plan and administered and sponsored

by Steinmann as trustee of the plan in New York, New York, approximate to where the trustee is located.

182.    Upon information and belief, Subsequent Transferee Defendant David P. Steinmann Money Purchase Pension Plan, was established as a pension plan and administered and sponsored by Steinmann as trustee of the plan in New York, New York, approximate to where the trustee is located.

183.    Upon information and belief, Subsequent Transferee Defendant Elizabeth R. Varet Defined Benefit Plan & Trust was established as a defined benefit plan and trust that was administered and sponsored by Varet, as trustee of the plan in Riverdale, New York, approximate to where the trustee is located.

184.    Upon information and belief, Subsequent Transferee Defendant Elizabeth R. Varet Money Purchase Pension Plan was established as a pension plan and administered and sponsored by Varet as trustee of the plan in Riverdale, New York, approximate to where the trustee is located.

185.    Upon information and belief, Subsequent Transferee Defendant Laura M. Roberson-Fisch Money Purchase Pension Plan was established as a pension plan and administered and sponsored by Laura M. Roberson-Fisch as trustee of the plan in New York, New York, approximate to where the trustee is located.

186.    Upon information and belief, Subsequent Transferee Defendant Laura M. Roberson-Fisch Profit Sharing Plan was established as a profit sharing plan and administered and sponsored by Laura M. Roberson-Fisch as trustee of the plan in New York, New York, approximate to where the trustee is located.

187.    Upon information and belief, Subsequent Transferee Defendant Michael G. Fisch Profit Sharing Plan was established as a profit sharing plan and administered and sponsored by Fisch as trustee of the plan in New York, New York, approximate to where the trustee is located.

### 4.    Entities

188.    Upon information and belief, Subsequent Transferee Defendant ASB, L.L.C. is a limited liability company that was formed under the laws of the State of Delaware.

189.    Upon information and belief, Subsequent Transferee Defendant CDK Partners is a general partnership that was formed under the laws of the State of New York.  Its principal place of business is located in New York, New York.  The partners of CDK Partners are Jane P. Klein and Charles D. Klein.

190.    Upon information and belief, Subsequent Transferee Defendant Klein Family Holdings, L.L.C. is a limited liability company that was formed under the laws of the State of New York.  Its principal place of business is located in New York, New York.  Klein is the manager of Defendant Klein Family Holdings, L.L.C.  The members of Klein Family Holdings, L.L.C. include Klein and the Charles D. Klein 2001 Family Trust (Jane P. Klein and Benjamin E. Nickoll, trustees).

191.    Upon information and belief, Subsequent Transferee Defendant Darmel Management, L.L.C. is a limited liability company that was formed under the laws of the State of Delaware.  Its principal place of business is located in New York, New York.

192.    Upon information and belief, Subsequent Transferee Defendant Decimal Investments, L.L.C. is a limited liability company that was formed under the laws of the State of Delaware.  Its principal place of business is located in New York, New York.  The managers of Decimal Investments, L.L.C. are Michael A. Varet and Elizabeth R. Varet.  The members of

Decimal Investments, L.L.C. include Michael A. Varet, Elizabeth R. Varet, Michael A. Varet as custodian for David R. Varet and Elizabeth R. Varet as custodian for David R. Varet.

193.    Upon information and belief, Subsequent Transferee Defendant JJG Enterprises is a business entity whose registered agent is David P. Steinmann.  Its principal place of business is located in New York, New York.

194.    Upon information and belief, Subsequent Transferee Defendant P&I Partners is a nominee account for the Rosenwald Family.  Its principal place of business is located in New York, New York.

195.    Upon information and belief, Subsequent Transferee Defendant South Lake, L.L.C. is a limited liability company that was formed under the laws of the State of New Jersey. Its principal place of business is located in South Orange, New Jersey.  Goldstein is the manager of South Lake, L.L.C.  The members of South Lake, L.L.C. include Goldstein, Goldstein as custodian for Dara and Meryl Goldstein and Joyce W. Goldstein as custodian for Dara and Meryl Goldstein.

### 5.    Funds and Foundations

196.    Upon information and belief, Subsequent Transferee Defendant 1185 Park Avenue Foundation, Inc. is a corporation that was formed under the laws of the State of New York.  Its principal place of business is located at 1185 Park Avenue, New York, New York. Steinmann is President of 1185 Park Avenue Foundation, Inc.

197.    Upon information and belief, Subsequent Transferee Defendant The Abstraction Fund is a non-profit corporation that was formed under the laws of the State of New York.  Upon information and belief, its principal place of business is located in New York, New York.  The officers and directors of The Abstraction Fund include Steinmann, Alexander G. Anagnos and

40

Stuart H. Coleman.  Steinmann has authority to act alone on behalf of The Abstraction Fund with respect to the Abstraction Fund's accounts.

198.    Upon information and belief, Subsequent Transferee Defendant American Philanthropic Foundation is a corporation and its principal place of business is located in New York, New York.

199.    Upon information and belief, Subsequent Transferee Defendant Anchorage Charitable Fund is a non-profit corporation that was formed under the laws of the State of New York.  Its principal place of business is located in New York, New York.  The officers and directors of Anchorage Charitable Fund include Elizabeth R. Varet, Michael A. Varet, Sarah R. Varet, David R. Varet and Joseph R. Varet.

200.    Upon information and belief, Subsequent Transferee Defendant The Charles and Jane Klein Family Fund is a non-profit corporation formed under the laws of the State of New York.  The officers and directors of The Charles and Jane Klein Family Fund include Charles D. Klein, Jane P. Klein, Andrew Klein and Elizabeth Klein.

201.    Upon information and belief, Subsequent Transferee Defendant The Reed L. Harman and Nan M. Harman Foundation is a non-profit corporation that was formed under the laws of the State of California.  Its principal place of business is located in Redondo Beach, California.  The officers of The Reed L. Harman and Nan M. Harman Foundation include Reed L. Harman and Nan M. Harman.

202.    Upon information and belief, Subsequent Transferee Defendant Hudson Charitable Fund is a non-profit corporation that was formed under the laws of the State of New York.  Upon information and belief, its principal place of business is located in New York, New York.  The directors of Hudson Charitable Fund include Michael A. Varet, Joseph R. Varet,

Sarah R. Varet and David R. Varet.  The officers of Hudson Charitable Fund include Michael A.

Varet, Steinmann and Nicholson.  Michael A. Varet was authorized to act alone on behalf of

Hudson Charitable Fund with respect to the Fund's accounts.

203.    Upon information and belief, Subsequent Transferee Defendant JJG Foundation,

Inc. is a non-profit corporation that was formed under the laws of the State of New York.  Upon

information and belief, its principal place of business is located in New York, New York.  The

officers and directors of JJG Foundation, Inc. include Steinmann and Nicholson.

204.    Upon information and belief, Subsequent Transferee Defendant Metropolitan

Philanthropic Fund, Inc. is a corporation that was formed under the laws of the State of New

York.  Its principal place of business is located in New York, New York.

205.    Upon information and belief, Subsequent Transferee Defendant Alice Rosenwald

Fund is a non-profit corporation that was formed under the laws of the State of New York.  Upon

information and belief, its principal place of business is located in New York, New York.  The

officers and directors of Alice Rosenwald Fund include Alice Rosenwald and Nicholson.

206.    Upon information and belief, Subsequent Transferee Defendant William

Rosenwald Family Fund, Inc. is a corporation that was formed under the laws of the State of

New York.  Its principal place of business is located in New York, New York.  The directors of

William Rosenwald Family Fund, Inc. include Nina Rosenwald, Elizabeth R. Varet, Alice

Rosenwald and Steinmann.  The officers of William Rosenwald Family Fund, Inc. include Varet

and Steinmann.

## IV.    BACKGROUND, THE TRUSTEE AND STANDING

207.    On the Filing Date, Madoff was arrested by federal agents for violation of the

criminal securities laws, including, *inter alia*, securities fraud, investment adviser fraud, and mail

and wire fraud.  Contemporaneously, the Securities and Exchange Commission ("SEC") filed a

complaint in the District Court which commenced the District Court Proceeding against Madoff and BLMIS. The District Court Proceeding remains pending in the District Court. The SEC complaint alleged that Madoff and BLMIS engaged in fraud through the investment adviser activities of BLMIS.

208.    On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. (the "Receiver") as receiver for the assets of BLMIS.

209.    On December 15, 2008, pursuant to section 78eee(a)(4)(A) of SIPA, the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to section 78eee(a)(4)(B) of SIPA, SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

210.    Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

    a.    appointed the Trustee of the liquidation of the business of BLMIS pursuant to section 78eee(b)(3) of SIPA;

    b.    appointed Baker & Hostetler, L.L.P. as counsel to the Trustee pursuant to section 78eee(b)(3) of SIPA;

    c.    removed the case to this Court pursuant to section 78eee(b)(4) of SIPA; and

    d.    released the Receiver for BLMIS.

211.   By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person.   Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

212.   At a Plea Hearing on March 12, 2009 in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pleaded guilty to an eleven-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York.   At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."   Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50). Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal."   *Id.*   Madoff was sentenced on June 29, 2009 to 150 years in prison.

213.   On August 11, 2009, a former BLMIS employee, Frank DiPascali, pleaded guilty to participating in and conspiring to perpetuate the Ponzi scheme.   At a Plea Hearing on August 11, 2009 in the case entitled *United States v. DiPascali,* Case No. 09-CR-764 (RJS), DiPascali pleaded guilty to a ten-count criminal information.   Among other things, DiPascali admitted that the fictitious scheme had begun at BLMIS sometime in the 1980s.   Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali,* No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (Docket No. 11).

214.   As the Trustee appointed under SIPA, the Trustee is charged with recovering and paying out Customer Property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors.   The Trustee is in the process of marshaling BLMIS's assets, and the liquidation of BLMIS's assets is well underway.

Such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years. The Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from customers and others who received preferences, payouts of fictitious profits and/or other avoidable transfers to the detriment of other defrauded customers whose money was consumed by the Ponzi scheme. Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of SIPA section 78fff-2(c)(1).

215. Pursuant to section 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code in addition to the powers granted by SIPA pursuant to SIPA section 78fff(b). Chapters 1, 3, 5 and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA.

216. Pursuant to sections 78fff(b) and 78*lll*(7)(B) of SIPA, the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.

217. The Trustee is a real party in interest and has standing to bring these claims pursuant to SIPA § 78fff-1 and the Bankruptcy Code, including §§ 323(b), 541, 544 and 704(a)(1), because, among other reasons:

      a. BLMIS incurred losses as a result of the conduct set forth herein;

      b. BLMIS customers and/or the customer property estate were injured as a result of the conduct detailed herein;

      c. SIPC cannot by statute advance sufficient funds to the Trustee to fully reimburse all BLMIS customers for all of their losses;

     d.     the Trustee will not be able to fully satisfy all claims;

     e.     the PJ Vehicle received customer property as defined in SIPA § 78lll(4) as "cash and securities . . . at any time received, acquired, or held by or for the account of a debtor from or for the securities accounts of a customer, and the proceeds of any such property transferred by the debtor, including property unlawfully converted" ("<u>Customer Property</u>");

     f.     the Trustee, as representative of, and as bailee of, the Customer Property estate, can sue as a real party in interest to pursue Customer Property for equitable distribution;

     g.     to the extent the Trustee has received express assignments of certain BLMIS customer claims, which they could have asserted, the Trustee stands in the shoes of persons who have suffered injury-in-fact, and a distinct and palpable loss for which the Trustee is entitled to seek monetary damages;

     h.     SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding. SIPC has expressly assigned to the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds;

     i.     the Trustee has the power and authority to bring claims and to avoid and recover transfers pursuant to §§ 541, 544, 547, 548, 550(a), and 551 of the Bankruptcy Code, the N.Y. DCL §§ 270 *et seq.* and SIPA § 78fff-2(c)(3); and

     j.     the Trustee has the rights and powers of any creditor under § 544 of the Bankruptcy Code.

## V.     THE PONZI SCHEME

218.     BLMIS was founded by Madoff in 1959 and, for most of its existence, operated from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, chairman, chief executive officer, and sole owner, operated BLMIS together with several of his friends and family members.  BLMIS was registered with the SEC as a securities broker-dealer under Section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78o(b). By virtue of that registration, BLMIS was a member of SIPC.  BLMIS had three business units: market making, proprietary trading, and investment advisory (the "IA Business").

219.     Outwardly, Madoff ascribed the consistent success of the IA Business to the so-called split-strike conversion strategy ("SSC Strategy").  Under that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the Standard & Poor's 100 Index ("S&P 100") – a collection of the 100 largest publicly traded companies.  Madoff claimed that his basket of stocks would mimic the movement of the S&P 100.  He also asserted that he would carefully time purchases and sales to maximize value, and BLMIS customers' funds would, intermittently, be out of the equity markets.

220.     The second part of the SSC Strategy was the hedge of Madoff's stock purchases with S&P 100 Index options contracts.  Those option contracts acted as a "collar" to limit both the potential gains and losses on the basket of stocks.  Madoff purported to use proceeds from the sale of S&P 100 Index call options to finance the cost of purchasing S&P 100 Index put options. Madoff told BLMIS customers that when he exited the market, he would close out all equity and option positions and invest all the resulting cash in United States Treasury bills or in mutual funds holding Treasury bills.  Madoff also told customers that these "round-trips" into the market would occur between six and ten times each year.

47

221.   BLMIS's IA Business customers received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. The securities purchases and sales shown in the account statements never occurred, and the profits reported were entirely fictitious. At the Plea Hearing, Madoff admitted that he never made the investments he promised clients, who believed they were invested through him in the SSC Strategy. He further admitted that he never purchased any of the securities he claimed to have purchased for IA Business' customer accounts. In fact, there is no record of BLMIS having cleared a single purchase or sale of securities in connection with the SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities. Instead, investors' funds were principally deposited into the BLMIS Bank Account.

222.   Prior to his arrest, Madoff assured clients and regulators that he purchased and sold the put and call options on the over-the-counter ("OTC") market after hours, rather than through any listed exchange. Based on the Trustee's investigation to date, there is no evidence that the IA Business ever entered into any OTC options trades on behalf of IA Business account holders. Additionally, the Options Clearing Corporation, which clears all option contracts based upon the stock of S&P 100 companies, has no record of the IA Business having bought or sold any exchange-listed options on behalf of any IA Business customers.

223.   For all periods relevant hereto, the IA Business was operated as a Ponzi scheme. The money received from investors was not invested in stocks and options, but rather used to pay withdrawals and to make other avoidable transfers. Madoff also used his customers' investments to enrich himself, his associates, and his family.

224.   The falsified monthly account statements reported that the accounts of the IA Business customers had made substantial gains, but in reality, due to the siphoning and diversion

of new investments to fulfill payment requests or withdrawals from other BLMIS Accountholders, BLMIS did not have the funds to pay investors for those new investments. BLMIS only survived as long as it did by using the stolen principal invested by customers to pay other customers.

225.   It was essential for BLMIS to honor requests for payments in accordance with the falsely inflated account statements, because failure to do so promptly could have resulted in demand, investigation, the filing of a claim and disclosure of the fraud.

226.   In an effort to hinder, delay or defraud authorities from detecting the fraud, BLMIS did not register as an investment adviser until August 2006. In or about January 2008, BLMIS filed with the SEC an amended Uniform Application for Investment Adviser Registration. The application represented, *inter alia*, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion. In fact, in January 2008, BLMIS had approximately 4,900 active client accounts with a purported value of approximately $68 billion under management.

227.   Madoff's scheme continued until December 2008 when the requests for withdrawals overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

228.   Based upon the Trustee's ongoing investigation, there were more than 8,000 customer accounts at BLMIS over the life of the scheme. In early December 2008, BLMIS generated account statements for its approximately 4,900 open customer accounts. When added together, these statements purportedly showed that BLMIS customers had approximately $65 billion invested through BLMIS. In reality, BLMIS had assets on hand worth only a fraction of that amount. Customer accounts had not accrued any real profits because virtually no

investments were ever made.  By the time the Ponzi scheme came to light on December 11, 2008, with Madoff's arrest, investors had already lost approximately $19 billion in principal.

229.    Thus, at all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than its assets.  BLMIS was insolvent in that:  (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

## VI.    AMERICAN SECURITIES CREATES PJ, A SHELL INVESTMENT VEHICLE, TO INVEST WITH BLMIS

### A.    The Close Relationship Between American Securities, Madoff and Sterling Equities Leads to the PJ Vehicle's Investments with BLMIS

230.    For nearly 24 years, Klein, as an investment adviser at American Securities and its predecessor companies, was a primary financial adviser who the Rosenwald Family relied upon to recommend investments in securities, real estate and other investments.  Prior to joining American Securities, he was a securities analyst for Lehman Brothers and Bear Stearns, where he managed research groups and worked with investment banking partners and arbitragers on many multi-million dollar transactions.  *Institutional Investor* magazine designated Klein as an "all-star analyst."  He has substantial experience in managing hedge funds and funds of funds.  In that capacity, he developed substantial expertise in arbitrage investments—buying and selling offsetting positions similar to those purportedly used by BLMIS.  He has managed hundreds of millions of dollars in investments on behalf of American Securities and, upon information and belief, since 1991, raised hundreds of millions of dollars for various American Securities entities primarily by attracting investors from other wealthy families, as well as select institutions.  Klein was also a long-standing member of the New York Society of Securities Analysts.

231.    In or around 1991, American Securities began offering investment opportunities in private equity partnerships that it managed.  In its effort to recruit investors for those funds,

American Securities approached high net worth families and select institutions, including the partners at Sterling Equities ("Sterling").  During one of the early investor recruiting efforts, Klein was introduced to Saul Katz ("Katz") and Fred Wilpon ("Wilpon") of Sterling, for the purpose of discussing a real estate joint venture.  Shortly thereafter in 1991, American Securities and Sterling partnered to create a multi-million dollar real estate investment vehicle called Sterling American Property, Inc. ("SAP").  Over the last 20 years, the partnership has launched five SAP funds acquiring over $4.5 billion of real estate and real estate related assets — SAP I in or around 1991, SAP II in 1996, SAP III in 1999, SAP IV in 2002 and SAP V in 2006.

232.    Madoff—through his wife Ruth—invested in all five SAP funds, and Peter Madoff, Madoff's brother, invested in at least three of the five SAP funds.  In addition, BLMIS itself invested approximately $11.4 million in SAP.

233.    At various times from 1991 through the present, certain American Securities Insiders, including Klein, Varet and Steinmann, were members of SAP's investment committee.  SAP's investment committee also included Katz, Wilpon, and other Sterling partners.  Katz, Wilpon and other Sterling partners had been heavily invested with BLMIS for tens of millions of dollars since 1985.  Upon information and belief, SAP's investment committee met routinely to discuss how to manage and grow their investments.

234.    Between 1991 and 1996, certain individuals at Sterling asked Klein many times if American Securities—and by extension the Rosenwald Family and various American Securities associates—would like to invest with BLMIS.  By 1996, Katz, Wilpon and other Sterling partners had about $150 million invested among 100 or more accounts with BLMIS.  Upon information and belief, Klein repeatedly declined to commit American Securities to investing

51

with BLMIS because, in part, Klein did not understand how Madoff achieved his investment returns.

235.    Klein has admitted that typically, before investing anywhere from $5 million to $10 million in companies that dealt with investments in securities, he met with managers of the potential investment companies, reviewed public filings of those companies, reviewed the performance history of those companies and discussed the potential investment with other investors.   Klein performed this basic diligence to become comfortable before making an investment or placing money for investment with such investment companies.   Based upon Klein's 25 years of experience in the securities markets, he knew that securities prices fluctuate. Klein also knew that the volatility of the securities markets is beyond control.   And he knew that to become comfortable investing a substantial amount of money in the securities market, he needed to understand as much as he could about the vehicle in which he was investing.

236.    Prior to opening an account with BLMIS on behalf of the Rosenwald Family Office and other PJ Account Participants, Klein was introduced to Madoff by Katz and met with both Madoff and Katz to discuss investing with BLMIS.

237.    By Klein's own admission, during that meeting, Madoff told Klein that he would not permit American Securities to invest with BLMIS if any of the PJ Account Participants were SEC registered representatives.   Madoff, in his efforts to avoid SEC scrutiny, told Klein, among other things, that he did not want registered SEC representatives to be a part of the pooled American Securities' investment because he wanted to avoid the burdens and restrictions that govern trading by SEC registered representatives.

238.    Neither Klein nor any of the other American Securities Insiders took any steps to independently investigate why Madoff refused to accept investments from SEC registered

representatives.  Klein and certain other American Securities Insiders agreed with Madoff's condition that no SEC registered representatives would be part of the American Securities' investment pool without asking Madoff for any further explanation.

239.    In a very brief August 16, 1996 investment memorandum circulated by Klein ("Klein Memo") to Steinmann, Varet, and Mastbaum concerning Madoff, Klein glossed over such indicia of fraud as Madoff's refusal to invest on behalf of registered representatives, Madoff's potential improper use of his market making business and BLMIS's never having had a "down year," while explaining the basis for recommending the Rosenwald Family's initial investment.  Specifically, the four paragraph memo explained that "[t]hrough Saul Katz's intervention, Bernard Madoff & Co. has agreed to manage the money" for American Securities "provided that none of the accounts are those of registered representatives."  The fact that Madoff wanted to avoid the restrictions associated with operating with registered representatives should have been cause for suspicion.

240.    Also, Madoff was described in the Klein Memo as a "market maker" who is "able to buy and sell on the bid and asked [sic] side of the market" resulting in an investment strategy that, "[a]ccording to Saul . . . has produced 15% - 19% since 1984," never once having a "down year."  But Klein, a sophisticated investment professional, had no understanding of how Madoff so perfectly timed the market, a clear red flag that should have caused him to conduct diligence. Instead, Klein believed that Madoff exploited his role as a "market maker" for the financial gain of the IA Business's customers.

241.    Klein's recommendation to the Rosenwald Family and American Securities to invest with Madoff had very little to do with his limited understanding of Madoff's purported

investment strategy and a lot to do with Sterling's relationship with Madoff and Sterling's improbably consistent positive returns for 14 years.

242.    Unlike other $5 million to $10 million investments in securities, Klein deviated from his own standards and practices of over 25 years and eventually recommended that the Rosenwald Family and other PJ Account Participants invest with BLMIS without understanding how Madoff achieved his improbably consistent returns.

243.    Shortly after circulation of the Klein Memo, the Rosenwald Family and certain associates of American Securities invested with BLMIS through the PJ Vehicle.   Upon information and belief, certain American Securities Insiders decided that approximately $5.6 million of the initial investment with BLMIS would come from accounts belonging to Varet, Alice Rosenwald Sigelman and Nina Rosenwald, $600,000 from American Securities' employees and other associates, and $200,000 to $300,000 from the WR Family Associates pension account, a pension plan for employees of the Rosenwald Family.

244.    The first PJ Vehicle BLMIS account was given a "KW" prefix similar to other accounts referred by Sterling or Katz to BLMIS and, as mentioned in the Klein Memo, Sterling agreed to introduce the accounts and do the accounting of this account *pari passu* with their own. After opening BLMIS account 1KW172, on or about September 12, 1996, American Securities Insider Mastbaum, an officer of American Securities, sent Arthur Friedman, a partner at Sterling, a check in the amount of $6,665,000, representing the Rosenwald Family's and certain American Securities associates' initial investment with BLMIS.

245.    From 1996 until December 2008, the American Securities Insiders advised certain other PJ Account Participants to invest with BLMIS through the PJ Vehicle and/or supervised or administered millions of dollars of investments for the PJ Account Participants with BLMIS.

54

B.    **The American Securities Insiders' Sophisticated Roles In Managing, Tracking and/or Administering The PJ Vehicle**

246.    At various relevant times, certain American Securities Insiders, including Steinmann, Mastbaum and Nicholson were fund administrators and/or supervisors in the Back Office who had direct access to information about the PJ Accounts reported by BLMIS to Sterling.

247.    The Back Office, supervised by Steinmann, was comprised of American Securities' employees and operated as an accounting arm of American Securities and the Rosenwald Family Office.

248.    At all relevant times, the Back Office also maintained the records and performed accounting services on behalf of the PJ Account Participants' investments with BLMIS through the PJ Investment Vehicle.  Specifically, the Back Office reviewed the PJ Accounts' BLMIS statements, tracked PJ Account Participants' investments with and withdrawals from BLMIS, maintained the books and records of investments through the PJ Vehicle, prepared tax forms pertaining to investments through the PJ Vehicle and arranged wire transfers in and out of the PJ Accounts.

249.    Mastbaum, upon information and belief, served as the Chief Financial Officer and Chief Compliance Officer of American Securities from 1994 to at least 2002.  In that capacity, upon information and belief, Mastbaum reviewed the initial investments in the PJ Vehicle account No. 1KW172 in September 1996 and confirmed with partners of American Securities the amounts they wished to invest and through what accounts.

250.    Upon information and belief, from 1996 through 2002, Mastbaum oversaw the Back Office's administration of account No. 1KW172.  Mastbaum also supervised and advised the Rosenwald Family on issues related to the Back Office and was, upon information and belief,

55

responsible for assuring that BLMIS's trade confirmations were received by American Securities. A review of these trade confirmations would have raised suspicions that Madoff was operating a fraud.

251. Upon information and belief, since the inception of the PJ Vehicle, Steinmann, as the Chief of Staff and Management Executive for the Rosenwald Family Office and a Managing Director of American Securities, received monthly reports from the Back Office of BLMIS's returns and reported those returns to other American Securities Insiders including Varet and Goldstein. A review of these statements illustrating BLMIS's improbably consistent positive returns would have raised suspicions that Madoff was operating a fraud.

252. Nicholson advised American Securities on various technical issues that concerned the Back Office. Around that same time, Nicholson also assisted in the formation of PJ LLC and continued to perform various functions pertaining to investments in the PJ Vehicle, including, but not limited to, executing transactions within the PJ Accounts, instructing employees in the Back Office to send information concerning Madoff's returns to Steinmann, keeping apprised of information needed to track the Rosenwald Family's investments with BLMIS and advising the Rosenwald Family on what to do with their investments with BLMIS.

253. Nicholson was also responsible for monitoring the Rosenwald Family's investments with BLMIS and communicating to the Rosenwald Family advice concerning such investments. For example, the Rosenwald Family reduced their investment with BLMIS in the spring of 2008 (the same year Madoff was arrested) because at that time the BLMIS investment was, in Nicholson's words, "in the forefront of people's minds." As illustrated in a May 29, 2008 email from Nicholson to various members of the Rosenwald Family concerning "PJ

Rebalancing," Nicholson was instrumental in reducing the Rosenwald Family investment in
BLMIS through the PJ Vehicle. Specifically, Nicholson writes:

> For many years the back office has "re-balanced" PJ each month to insure that
> accounts remained under the cap on total assets invested in PJ. We continue to do
> this, with the new lower caps that most accounts have in place it means that cash
> will come out of PJ into the account's Chase Account. We wanted you to be
> aware of this so you understand why some money might suddenly appear in your
> account in the next few days, and since PJ is in the forefront of people's minds
> these days so you know that we are watching the account . . .. If you would like
> to know the amounts we can provide them, but mainly wanted everyone to know
> that it is being watched (and has been).

254.    Goldstein, the Manager of North Peak, a limited liability company that is owned
by American Securities, was also a sophisticated investment adviser at American Securities.
Goldstein had substantial experience in managing hedge funds, funds of funds and arbitrage
investments. He managed hundreds of millions of dollars in investments on behalf of American
Securities and, upon information and belief, since 1991, raised hundreds of millions of dollars
for various American Securities entities primarily by attracting investors from other wealthy
families, as well as select institutions.

255.    Upon information and belief, Klein consulted with Goldstein before investing
with BLMIS.

256.    Upon information and belief, due to the lack of transparency of Madoff's SSC
Strategy, Goldstein tracked the trades made by BLMIS for the PJ Vehicle to understand how
Madoff's investment strategy worked. Upon information and belief, Goldstein monitored the PJ
Accounts, especially the prices at which securities were purportedly bought and sold by BLMIS
on behalf of the PJ Vehicle. A review of this information would have raised suspicions that
Madoff was operating a fraud.

## VII.    AMERICAN SECURITIES PURCHASED ONE-OF-A-KIND FRAUD INSURANCE FOR ITS MADOFF INVESTMENT

257.    Although Klein believed that Madoff delivered "consistent, safe rates of return," nevertheless, he and other American Securities Insiders, including Mastbaum and Steinmann, upon information and belief, decided in late 1999 or early 2000 to procure a one-of-a-kind insurance policy to insure the PJ Vehicle's investments with BLMIS against fraud or criminal acts by Madoff and/or BLMIS.

258.    Around the same time, in January 2000, the PJ Vehicle made its first withdrawal out of account No. 1KW172.

259.    On or around January 24, 2000, Klein, Steinmann, Mastbaum and Dimini, met with insurance broker Frank Crystal & Co. ("FCC") to discuss insuring the PJ Account Participants' investments with Madoff.  In February, FCC was able to secure a proposal for the insurance policy.  As explained in an internal memorandum dated March 13, 2000 authored by American Securities Insider Mastbaum, the insurance policy "as proposed would cover criminal and/or fraudulent acts" committed by certain third party entities including BLMIS, Chase Manhattan Bank, N.A., Bear Stearns & Company and Credit Suisse First Boston "and by any of their principals, officers, employees or agents, directly resulting in a loss up to a maximum limit of or around $50 million," the approximate amount of money purportedly held in account No. 1KW372 at that time.

260.    American Securities ultimately obtained the Madoff Policy to insure its investments with BLMIS against fraud in or around March 2000.  Klein's concerns regarding Madoff were apparently so profound that a year after acquiring the Madoff Policy, in or around February 2001, Klein recommended that his business partner, Saul Katz, and other Sterling

partners who invested with BLMIS, also purchase the same insurance policy to cover their investments with BLMIS against a possible Madoff fraud, including a Ponzi scheme.

261.    Although insured parties under the Madoff Policy included several entities other than the PJ Vehicle, the Madoff Policy was structured as a third party fidelity bond primarily to protect investments with BLMIS against losses resulting from crime or fraud committed by Madoff.  Indeed, in a February 20, 2002 email from Dimini to Mastbaum, copying Subsequent Transferee Defendants Aptman and Steinmann, Dimini writes that the fidelity bond is "in place to cover dishonest acts by Madoff."  In a later email concerning renewal of the policy, Mastbaum explains to Nicholson, Steinmann and Dimini that "[t]he policy, as originally placed, protected against fraud (theft-Ponzi schemes) or a loss in excess of SIPC limits resulting from a Madoff bankruptcy."  (Emphasis added.)

262.    The Madoff Policy was a "one-of-a-kind policy," underwritten by the multinational insurance company American International Group, Inc. through its member company National Union Fire Insurance Company (collectively, "AIG") and Liberty Mutual Insurance Company ("Liberty"), specifically at American Securities' behest.

263.    In March 2001 through March 2002, the Madoff Policy insured up to $55 million in investments, costing the insured parties a six-figure premium, all of which was paid by funds from the PJ Account.

264.    In early 2002, Mastbaum suggested to "up the ante to $65 million" because the BLMIS investment was continuing to grow and he did not want "any uninsured money in the PJ fund (the investing partnership in Madoff)."  Around that same time, in an attempt to pay a lower premium on the "relatively expensive," one-of-a-kind insurance, and as further evidence that the Madoff Policy was procured by American Securities primarily to protect against theft by Madoff,

American Securities considered removing all financial institutions other than BLMIS from the insurance policy.

265.    Specifically, in a February 28, 2002 email, Dimini asked a broker at FCC "[i]f we were to delete the other financial institutions and leave only Madoff, would that have any mitigating effect on the premium?"  Upon information and belief, the answer was no: removing the names of the other financial institutions would not have a mitigating effect on the premium, and, as a result, those institutions remained on the policy.  Nevertheless, American Securities Insiders' sole concern was ensuring that the investments with BLMIS were covered by the policy.

266.    In June 2002, upon information and belief, Steinmann tasked Dimini with asking FCC whether the one-of-a-kind insurance guaranteed investment gains.  In a June 14, 2002 email from Dimini to Steinmann, Dimini explained that the "policy DOES NOT guarantee investment gains.  If statements were to say that out [sic] accounts are up 30% for a year and they really aren't, there is no recourse under this bond for the misrepresented increase under this bond – nor would there be any for an actual investment loss.  This bond covers theft.  If Madoff runs off with our money – however much that may be – that is the amount we would recover (up to $50 million)."  (Emphasis in original.)

267.    In March 2003, American Securities again renewed the Madoff Policy with a $50 million limit, the amount approximately equal to the amount invested with BLMIS.

268.    When the one-of-a-kind Madoff Policy came up for renewal in March 2004, AIG refused to renew the insurance.  Although AIG agreed to insure the PJ Vehicle's investments with Madoff from 2000 through 2003 without knowing Madoff's operations, in 2004 AIG was no longer willing to overlook the risk of insuring a third-party investment that could not be

verified and where the investment advisor, Madoff, was not responsive to requests for information.

269.    On March 16, 2004, Dimini wrote an email to Steinmann, copying Mastbaum, stating that AIG "is beginning to balk at writing this one of a kind policy.  Per Bob [an FCC broker], <u>the insurance in place on the investment in Madoff is unique in the insurance industry and was written especially at our behest</u>" (emphasis added).  Subsequent to this email, FCC continued to work with AIG about changing the wording of the policy because AIG was no longer willing to cover the risk of investing with Madoff.

270.    Almost five months later, on August 13, 2004, Dimini again wrote to Steinmann and Mastbaum about the Madoff Policy.  In that email, Dimini explained that their broker "finally got a copy of the change in policy language and was very unhappy with it; he advised [Dimini] that essentially [they] would be paying a huge premium for virtually no coverage."

271.    On August 14, 2004, Steinmann emailed Dimini, Mastbaum and Nicholson, "[i]f we can, let's make sure we can get enough extensions so we can at least let people know if the coverage isn't continued . . ..  I wouldn't want anyone staying in Madoff thinking the coverage was there if it isn't."  PJ Account Participants knew that their investments with Madoff were insured against the risk of Madoff being a fraud.  It was important to American Securities Insider Steinmann to notify PJ Account Participants that their investments with Madoff were no longer free of any risk of a Ponzi scheme.

272.    Nicholson replied, "[c]an someone summarize for me what we are insured against?  I've never quite understood except a vague feeling that it was primarily protection against a 'ponzi' [sic] scheme or some situation where we went to redeem the principal and it

wasn't 'there'."  Mastbaum replied, "[t]he policy, as originally placed, protected against fraud (theft-Ponzi schemes) or a loss in excess of SIPC limits resulting from a Madoff bankruptcy."

273.    In a separate email dated August 16, 2004, Dimini wrote to American Securities Insiders Varet and Klein, copying Steinmann, Nicholson and Mastbaum, that AIG had "expressed discomfort with writing such an unusual policy where they are basically insuring the honesty of an <u>unknown entity</u> that has not even completed an application" (emphasis added).

274.    Subsequently, a broker at FCC explained to Nicholson and Dimini that after conducting a nearly exhaustive survey of the insurance marketplace, he was unable to find any other insurer that would provide a similar one-of-a-kind third party fidelity bond to cover the risks insured under the lapsed insurance policy, including Lloyds of London.  According to their broker at FCC, despite a "prevailing belief and historical publicity that Lloyds will insure anything," Lloyds of London did not agree to insure the investments with BLMIS.

275.    On August 31, 2004, Nicholson circulated an internal memorandum to Varet and Steinmann, copying Dimini, Klein, Mastbaum, and Defendant Stuart Coleman describing a recent conference call with FCC.  In that memo, Nicholson writes that their insurance broker at FCC "kept reminding us that we are talking about [a] very large single incident exposure ($50mm) where there is no pool of policies providing the carrier with premiums to justify the exposure" and concluding that the "size of the risk and the unique nature of the arrangement (3rd party coverage)" made it difficult to obtain insurance for the BLMIS investment and that "there is little likelihood this insurance would get replaced."

276.    The Madoff Policy expired on September 11, 2004.  American Securities sent out notices to PJ Account Participants, with the subject line reading "Notice Regarding Your Madoff Investments," to alert them to the loss of insurance for their BLMIS investments.  Specifically, as

described in an email from Dimini to Nicholson, she and Defendant Canty coordinated a list of PJ Account Participants and "since nearly all are part of a group of accounts identified by an 'insider' (DPS, CDK, MGF, etc.), we're thinking that the best way to handle the notification is to list all associated accounts . . . and email the notice and account listing to the principal office contact (i.e., DPS, CDK, MGF, etc.), requesting that they handle the immediate advisement and conferment [sic] on this matter with the participants in their related accounts."

277.    Upon information and belief, American Securities Insiders made every effort to obtain insurance to protect the PJ Account Participants' investments with BLMIS because they had clear concerns about BLMIS and Madoff's legitimacy.

## VIII.    AMERICAN SECURITIES RESTRUCTURED THE PJ INVESTMENT VEHICLE IN AN EFFORT TO LIMIT ITS LIABILITY FOR RECOMMENDING BLMIS

278.    In addition to obtaining the theft and fraud policy, upon information and belief, in response to concerns about potential civil liability for recommending BLMIS to its associates, and to their friends and family members who invested through PJ LP, on July 25, 2002, American Securities formed a limited liability company called PJ LLC to serve as the new investment vehicle for the PJ Account Participants' investments with BLMIS.

279.    PJ LLC served the same purpose as PJ LP, a pass-through vehicle by which the PJ Account Participants could invest with BLMIS, and was formed as the successor to PJ LP.

280.    According to the Limited Liability Company Agreement of P.J. Administrator LLC dated July 25, 2002 ("Limited Liability Agreement"), the "business and affairs of [PJ LLC] shall be managed by the Members.  The Members shall have the power to do any and all acts necessary or convenient to or for the furtherance of the purposes described" in the agreement. The initial and only member of PJ LLC is North Peak.

281.    Upon information and belief, North Peak was created in 1998 to be dominated and controlled by American Securities.  American Securities Insider David Steinmann, upon information and belief, signed legal documents on behalf of North Peak, the address of which is care of American Securities, L.P.  According to the Certificate of Written Consent of the Sole Member of North Peak, LLC, signed in December 1998 by Defendants Neil Goldstein, as Manager of North Peak, and David Steinmann, on behalf of American Securities, L.P., North Peak was "treated as a pass-through entity for both federal and state tax purposes."  North Peak's Application for Authority to conduct business in New York was signed by Defendant Abe Mastbaum on March 17, 1999.

282.    Although the purposes of North Peak, according to the Certificate of Formation of North Peak signed on December 18, 1998, "are to serve as a general or limited partner of investment partnerships, to engage in such other businesses or activities as the manager may determine, and to take all actions necessary, appropriate, advisable, incidental or convenient to carry out the foregoing," North Peak completely ignored the corporate formalities that are part and parcel of a corporate existence.  Upon information and belief, North Peak did not have any employees or a payroll, nor did it hold corporate meetings or keep corporate records.  North Peak shared the same address as American Securities.  American Securities, as the sole member of North Peak, exercised complete dominion over and control of North Peak.  Thus, no corporate veil can be maintained between North Peak and American Securities.

283.    After PJ LLC was formed in July 2002, the PJ Account Participants were required to sign an Account Administration Agreement on or about April 2, 2003.  This agreement purported to substantially limit the duties and liabilities of the PJ Vehicle, American Securities and others regarding the administration of PJ Account Participants' investments with BLMIS.

284.    The Account Administration Agreement purports to release American Securities, the PJ Vehicle, American Securities Insiders and others of any liabilities with respect to the BLMIS investments**.**

285.    Specifically, the Account Administration Agreement provides that the PJ Vehicle, American Securities and "any of their respective affiliates, partners, members, officers, directors, employees and authorized persons, and members of the family of William Rosenwald . . . shall not be liable for . . . any action taken or omitted by it or for any loss or injury resulting from its actions or its performance or lack of performance of its duties hereunder, if any, in the absence of willful misconduct or actual fraud on its part."

286.    The laundry list of disclaimers contained in the Account Administration Agreement's waiver clause is prophetic.  It required the PJ Account Participants to acknowledge that the PJ Vehicle and the entities and individuals being cleared of liability had not made any recommendation or representation to the PJ Account Participants:

- "that an investment with Madoff is a suitable investment for such Account Participant;

- about Madoff or its activities or investment style or that the Administrator will monitor them, or that the Predecessor (*i.e.* PJ LP) has monitored them, in any manner;

- that the Administrator or any Predecessor has performed, or that the Administrator will perform, any due diligence inquiry about Madoff or its activities or investment style;

- about the risks associated with an investment with Madoff; or

- about any prior or future performance of an investment with Madoff."

287.   In addition to making PJ Account Participants sign an Account Administration Agreement, one or more of the American Securities Insiders opened PJ Account 1KW387 in the name of PJ LLC and, in or about July 2003, most, if not all of the funds reportedly in PJ Account 1KW172 were transferred to PJ Account 1KW387.

288.   The attempts to obtain the Madoff Policy, restructure PJ LP, and to require PJ Account Participants to sign waivers, supports the Trustee's allegations that American Securities and the American Securities Insiders' knew or should have known, or willfully turned a blind eye to the concern that Madoff was operating a fraud.   American Securities and the American Securities Insiders allowed the other PJ Account Participants to continue to pour tens of millions of dollars into BLMIS and attempted to shield themselves from the potential adverse consequences associated with these investments, rather than perform reasonable, independent and meaningful due diligence on Madoff and BLMIS in response to their concern that Madoff was operating a fraud.

## IX.   **AMERICAN SECURITIES INSIDERS WERE ON NOTICE OF NUMEROUS INDICIA OF FRAUD AT BLMIS**

289.   American Securities Insiders were on notice of sufficient facts indicating fraud, which gave rise to their duty to inquire into the legitimacy of their BLMIS investments and they failed to do so.

Among other things, certain American Securities Insiders were on notice of the following indicia of fraud but failed to make sufficient inquiry and instead, disregarded these red flags:

290.   **Improbably Consistent Returns**: Upon information and belief, the American Securities Insiders, as highly sophisticated financial professionals and/or investors, knew or should have known that BLMIS produced returns that were simply too good to be true, reflecting

a pattern of abnormal consistently positive returns that were simply not credible.  Between 1996 and 2008, the PJ Accounts did not experience any year of negative returns.

291.    Specifically, during the 131 months from January 1998 through November 2008 in which Defendants invested with BLMIS, BLMIS never reported any quarter of negative returns and only reported negative monthly returns on four occasions.  More precisely, BLMIS purported to achieve 104 months of positive returns for account 1KW172 during a 106-month period from September 1996 through June 2005, while the S&P 100 experienced 47 months of negative returns over the same period.  Positive returns were achieved for account 1KW387 for 63 months during a 65 month period from July 2003 through November 2008, while the S&P 100 experienced 26 months of negative returns over the same period.

292.    Goldstein knew that BLMIS's returns were too good to be true, commenting in a March 10, 2007 email to an accountant in the Back Office, during one of the rare down months, "well, I guess [Madoff is] human after all."  Goldstein knew BLMIS was doing well when other investments were not, in part because Steinmann and the Back Office accountants sent him, and the other American Securities Insiders, investment information concerning the PJ Vehicle.

293.    Defendants also ignored the fact that BLMIS's purported performance was unusually stable and consistently positive — especially for securities investments.  For example, a PJ Account Participant responded to news that BLMIS's returns were down that month by writing in an email dated March 15, 2007 to David Camhi, an accountant in the Back Office, "[t]hat's a first!!!"  Despite the PJ Vehicle's abnormally consistent positive returns, Defendants took no meaningful, reasonable or independent action to inquire further as to how such results could be achieved in accordance with Madoff's strike-split conversion strategy.

294.    Other skilled hedge fund managers could not match such consistently positive returns, and those managers who attempted to employ the SSC Strategy purportedly used by BLMIS consistently failed even to approximate its results.  Such returns would have required Madoff to perfectly time the market for over 10 years.  Numerous industry professionals viewed Madoff's alleged perfect timing based on market flow as indicative of illegitimate and illegal trading activity, yet the American Securities Insiders, who are highly sophisticated financial professionals and/or investors, ignored this red flag and, as indicated in an email dated April 15, 2008, from Subsequent Transferee Defendant I. Michael Wolfe copying Klein, were content to let "the mice in Bernie's black box keep doing their thing."  Indeed, the American Securities Insiders monitored the PJ Vehicle's monthly returns, sometimes communicating investment performance to other PJ Account Participants, and were aware that BLMIS produced surprisingly consistent returns.

295.    As shown below, the PJ Vehicle and BLMIS maintained consistent and positive rates of return during events that otherwise devastated the S&P 100.  According to customer statements prepared by BLMIS, the PJ Vehicle had yearly returns on its BLMIS investments shown in columns 2 and 3 in the table below.  When reviewed side-by-side with returns for the S&P 100 (column 4), these figures show that the PJ Vehicle's BLMIS investment was immune from any number of market catastrophes, enjoying steady rates of return at times when the rest of the market was experiencing financial crises.  For example, during the burst of the dotcom "bubble" in 2000, the September 11, 2001 terrorist attack and the recession and housing crisis of 2008, BLMIS purported to produce positive returns.  The American Securities Insiders chose to ignore this information.

| Year | PJ LP (1KW172) Rate of Return | PJ LLC (1KW387) Rate of Return | S&P 100 Rate of Return |
|---|---|---|---|
| 1996[4] | 5.3% | | 14.35% |
| 1997 | 19.5% | | 27.76% |
| 1998 | 17.8% | | 31.33% |
| 1999 | 19.0% | | 31.26% |
| 2000 | 14.5% | | (13.42%) |
| 2001 | 13.4% | | (14.88%) |
| 2002 | 12.6% | | (23.88%) |
| 2003 | 10.6% | | 23.84% |
| 2003[5] | | 5.5% | 12.31% |
| 2004 | | 10.0% | 4.45% |
| 2005 | | 10.4% | (0.92%) |
| 2006 | | 13.7% | 15.86% |
| 2007 | | 11.0% | 3.82% |
| 2008[6] | | 9.3% | (36.86%) |

296.    Madoff's strike-split conversion strategy purported to track the performance of the S&P 100 and its results were not credible.  BLMIS continued to generate positive returns even during the last 14 months of BLMIS's existence, when the S&P fell approximately 40 percent.  Such consistently positive returns have no correlation with the historical fluctuations of the S&P 100 Index, on which BLMIS's trading activity was purportedly based.  The strategy, in effect, was supposed to create a collar on the stock basket, limiting its upside while at the same time protecting against a sharp decline in the share price.  By design, there should have been some degree of correlation between BLMIS's returns and the S&P 100 Index, yet there appears to be no relation between BLMIS's returns and the S&P 100 Index.

297.    **Paper Statements:** The archaic technology employed by BLMIS's IA Business should have caused sophisticated financial professionals such as Klein, Steinmann and Nicholson to question the legitimacy of Madoff's operation.   Upon information and belief, Klein,

---

[4] The percentages for 1996 reflect the returns for September through December.

[5] These 2003 percentages reflect the returns for July through December 2003.

[6] The 2008 percentages are based on monthly returns from January 1, 2008 through November 30, 2008.

Steinmann and Nicholson were aware that the BLMIS IA Business did not generate electronic trade tickets, had no website where investors could view their accounts and assets in real-time and could only deliver paper trade statements by mail several business days after trades were supposedly executed.

298.    Upon information and belief, Klein, Steinmann and Nicholson knew that BLMIS was purportedly a pioneer in electronic over-the-counter trading mechanisms, but with the IA Business, BLMIS provided all its customers with only paper information, including paper statements once a month.

299.    BLMIS issued time delayed statements to hide the fact that Madoff was fabricating trades (so that he could pretend that BLMIS was always profitable).  The issuance of only paper statements was critical to Madoff's ability to perpetuate his Ponzi scheme.  BLMIS forged these phony statements already knowing the movements of the market.  Upon information and belief, Klein, Steinmann and Nicholson did not inquire into why BLMIS issued statements in hardcopy only, a highly irregular practice that a sophisticated investor and/or financial professional would have known is a red flag.

300.    Despite BLMIS's apparent technological sophistication, BLMIS did not provide its customers with electronic real-time online access to their accounts, which was and is customary in the industry for hedge fund and fund of funds investment advisers.   Upon information and belief, in or around October 2003, Defendants Canty and Nicholson requested that Madoff's office provide an electronic feed for the PJ Vehicle.  Canty followed-up on this request at least two times in the next four months.  Madoff's office ultimately ignored Canty's and Nicholson's requests for an electronic feed of trading information and never provided any electronic information for individuals investing through the PJ Vehicle.  Upon information and

belief, as early as March 2004, the American Securities Insiders were aware of BLMIS's refusal to provide electronic information despite repeated requests and did not perform any diligence in response to this red flag but instead the American Securities Insiders continued to funnel the PJ Account Participants' money into BLMIS.

301.    **No Segregation of Assets:**    Upon information and belief, based on Klein's personal meetings with Madoff, his business relationship with Madoff's investors at Sterling and more than a decade of doing business with Madoff, American Securities Insiders knew or should have known that, unlike a legitimate investment advisory firm, BLMIS self-executed, self-cleared and self-custodied trades, and thereby failed to adequately segregate assets.    Adequate segregation of assets allows independent checks and balances throughout the trading cycle, the movement of cash and the custody process, and is a fundamental area of inquiry for those performing reasonable, independent and meaningful due diligence on investment managers. Despite their sophistication and familiarity with fundamental industry practices, American Securities Insiders did not perform reasonable diligence into the practices surrounding BLMIS's segregation of assets.

302.    American Securities Insiders also knew that BLMIS functioned as investment adviser, prime broker and the "in-fact" custodian of the purported securities.    This structure — unusual for the hedge-fund industry — eliminated a key check and balance in investment management by excluding an independent custodian of securities from the process.    In other words, because BLMIS cleared and maintained custody of securities he purportedly traded, there was no independent safeguard in place to verify that BLMIS was actually making the trades he reported.    As highly sophisticated financial professionals and/or investors, American Securities

Insiders were fully aware that his lack of a third party custodian furthered the lack of transparency of BLMIS.

303.   By functioning in so many roles, BLMIS had no segregation between those responsible for trading and those responsible for recording trade activities, nor was there segregation of signing authority and authority over cash and securities transfers, deposits and withdrawals.  This is a clear conflict of interest and the complete lack of segregation of duties was on its face a red flag of possible fraud identified by numerous other industry professionals who performed basic due diligence on Madoff or BLMIS.  American Securities Insiders, who are highly sophisticated financial professionals and/or investors, ignored the possibility of fraud in this structure and instead obtained insurance to protect against theft or fraud by Madoff and/or BLMIS.

304.   **Lack of Transparency:**  Madoff avoided questions about his IA Business operations, was consistently vague in responding to any inquiries about his business and operated with no transparency.  Madoff even instructed Klein not to allow anyone to invest with BLMIS who was a registered representative, because, upon information and belief, Madoff wanted to avoid SEC scrutiny of his purported investment strategy and the trading restrictions that govern registered representatives.   Klein communicated to various American Securities Insiders including, Varet, Mastbaum and Steinmann, Madoff's refusal to accept investments from any registered investment representatives.  Despite its size and complexity, BLMIS was substantially a family-run operation, employing many of Madoff's relatives, and virtually no outside professionals.

305.   Based on similar concerns regarding Madoff's lack of transparency, numerous banks and industry advisers who made an effort to conduct reasonable due diligence were

unwilling to facilitate investments with BLMIS and Madoff, because of the lack of information available about his IA Business operations.  With respect to the PJ Vehicle, during or around the spring of 2007, Goldstein attempted to have his IRA with Fidelity Investments serve as custodian for his investment in the PJ Vehicle.  However, according to an April 14, 2008 email from Goldstein to various individuals, including American Securities Insiders Nicholson, Steinmann and Klein, Fidelity "never could get their arms around this investment" and "after going through several folks over there" Goldstein "gave up."  Upon information and belief, when Fidelity Investments decided not to custody the PJ investment in its IRA accounts, the American Securities Insiders found other banks, including Bear Stearns, to house their PJ Vehicle investments.

306.   **Trades Outside the Daily Trading Range**: Upon information and belief, the Back Office received, on behalf of the PJ Vehicle, monthly account statements and trade confirmations.  At times, the PJ Vehicle's monthly account statements and trade confirmations reflected trades on behalf of the PJ Accounts that were allegedly executed at prices outside the daily price range for such securities on the days in question.

307.   Between 1998 and 2008, there were 142 instances where BLMIS purported to execute an equity trade on the PJ Vehicle's behalf for which the executed price for those trades fell outside the daily price range.  For example, the PJ Vehicle's account 1KW387 statement for October 2003 reported the purchase of 26,334 shares of Intel Corporation (INTC), with a settlement date of October 7, 2003.  BLMIS's records, which reflect information provided on the trade confirmations, indicate these stocks were purchased on October 2, 2003 for $27.63 per share.  However, the daily price range for Intel Corporation stock purchased on October 2, 2003 ranged from a low of $28.41 to a high of $28.95.

308.   In an illustration of another purported trade outside the daily range, the December 2006 account statement for PJ Account 1KW387 reported a sale of 6,072 shares of Merck & Co. (MRK).  BLMIS's records, which reflect information provided on the trade confirmations, show these securities were purportedly sold at a share price of $44.61 on the trade date of December 22, 2006, and a settlement date of December 28, 2006.  However, the daily price range for MRK on December 22, 2006, ranged from $42.78 to $43.42.  Similarly, the February 2001 account statement for PJ Account 1KW172 reported a sale of 6,920 shares of J.P. Morgan Chase & Co. (JPM).  BLMIS's customer statements and records show these securities were purportedly sold at a share price of $52.59 on the trade date of February 16, 2001, and a settlement date of February 22, 2001.  However, the daily price range for JPM on February 16, 2001, ranged from $50.25 to $52.00.  The Trustee's investigation to date has revealed more than 140 instances between 1998 and November 2008 in which the PJ Vehicle's account statements displayed trades purportedly executed at a price outside the daily trading range.

309.   Upon information and belief, American Insider Goldstein tracked BLMIS's reported trades and communicated his findings to American Securities Insiders Klein and Mastbaum.  Irregularities in BLMIS's trading should have caused sophisticated hedge fund investors and arbitragers like Klein and Goldstein to perform more diligence on the operations of BLMIS.  Instead, they chose to ignore the red flags.

310.   **Market Volume:** Upon information and belief, American Securities Insiders Goldstein and Mastbaum frequently reviewed the PJ BLMIS account statements and trade confirmations.  Those account statements and trade confirmations show that Madoff represented BLMIS to be engaged in the execution of massive numbers of options trades to implement its purported strike-split conversion strategy.  To implement this strategy, BLMIS pretended to trade

S&P 100 Index options to hedge the investment in a representative basket of stocks; upon information and belief, the trade confirmations sent to the PJ Vehicle indicate that these options were exchange traded options. On at least 129 occasions over the course of the PJ Vehicle's investment with BLMIS, the options volume BLMIS reported to have engaged in on behalf of the PJ Vehicle exceeded the total number of S&P 100 Index options traded on the CBOE for that contract on that day. Experienced and sophisticated investors such as Goldstein and Mastbaum should have recognized the purported excessive trading.

311.    For example, on March 7, 2006, in account 1KW387, BLMIS purportedly traded on the PJ Vehicle's behalf a total of 1,112 S&P 100 Index put options (with April expiration and a strike price of 580), when the total volume traded on the CBOE for those S&P 100 Index put options for that day was 302. Similarly, on the same day, BLMIS purportedly traded on the PJ Vehicle's behalf a total of 1,112 S&P 100 Index call options (with April expiration and a strike price of 585), when the total volume traded on the CBOE for those S&P 100 Index call options for that day was 358. It would have been impossible for BLMIS's volume to exceed that of the CBOE for the identical contract on the same day, if the options were exchange traded.

312.    **Optimal Equity Prices:** Pricing reflected on the PJ Vehicle's account statements and, upon information and belief, the trade confirmations further demonstrated the implausibility of Madoff's trades, which almost always occurred at precisely the right time of the day. With remarkable consistency, when Madoff was purchasing shares, the reported price was in the lower half of the daily trade range, and when selling shares, the sale price was in the upper half of the daily trade range. In purchasing or selling a stock several times during the trading day, Madoff's reported prices should have gravitated toward the daily midpoint. Instead, they gravitated toward Madoff's optimal price point — a statistical impossibility.

313.    For example, the PJ Vehicle's account statements, and upon information and belief, the trade confirmations indicate that, from 1998 to 2005, approximately 73 percent of equity buys occurred in the lower half of the daily price range and approximately 67 percent of equity sells occurred in the upper half of the daily price range for account 1KW172.  Similarly, from 2003 to 2008, approximately 81 percent of equity buys occurred in the lower half of the daily price range and approximately 73 percent of equity sells occurred in the upper half of the daily price range for account 1KW387.

314.    Because American Securities Insiders such as Klein, Goldstein and Mastbaum are sophisticated financial professionals and, upon information and belief, had access to the PJ Vehicle's account statements and trade confirmations, they should have known that these purported trades were statistically impossible.

315.    **Settlement Anomalies:** American Securities Insiders ignored options transactions made on behalf of the PJ Vehicle that settled in a time range outside of industry norms. According to industry standards, the settlement date for options listed on trading exchanges is the business day following the trade date, referred to as T+1.  However, upon information and belief the trade confirmations for the PJ Vehicle demonstrate that a high percentage of options contracts settled as late as three days after the trade date.  Between 1998 and 2008, at least 236 out of the 863 total options contracts transacted on behalf of the PJ Vehicles' BLMIS two accounts settled outside the normal period of T+1.  That means, over approximately 27 percent of all purported options activity in the PJ Vehicle's BLMIS accounts did not comply with standard trading practices; as sophisticated financial professionals and/or investors, the American Securities Insiders knew or should have known that these options transactions made on behalf of the PJ Vehicle were not normal.

316.    **Negative Balances**: Between September 1996 and June 2005, the PJ Vehicle's monthly account statements for 1KW172 reflected a negative balance on approximately 89 occasions for a total of 461 days.  Similarly, between July 2003 and November 2008, the PJ Vehicle's monthly account statements for 1KW387 reflected a negative balance on approximately 50 separate occasions for a total of 166 days.  Normally, when a customer purchases assets prior to the funds being available in the customer's account, the customer is buying on "margin."  However, the PJ Vehicle did not have a margin account with BLMIS and could not have traded on margin.  The fact that the PJ Vehicle had a negative cash balance with BLMIS on approximately 139 separate occasions, totaling 627 days during the history of its accounts with BLMIS but was still able to have trades executed on its behalf put the PJ Vehicle and those who oversaw and controlled it — namely, the American Securities Insiders — on inquiry notice of fraudulent activity at BLMIS.

317.    In a specific example, account 1KW172 purchased a basket of S&P 100 equities, which settled on June 15, 2001 and would have required a cash outlay of $41.6 million.  However, according to the account statement, at the time of this purchase, the account was purportedly invested in U.S. Treasuries.  Therefore, cash was not available in the PJ Vehicle's account to execute the purported purchases.  The account exhibited a significant negative cash balance until June 19, 2001, when the sale of $45.5 million of U.S. Treasuries settled.  Only upon that sale did the account receive enough cash to reestablish a positive cash balance.

318.    Even if BLMIS was buying on margin with the permission of the PJ Vehicle, the American Securities Insiders knew or should have known that BLMIS was acting in a suspiciously irregular, if not unlawful, manner.  When buying on margin, customers incur and are generally charged margin interest because buying on margin is effectively buying the

underlying security with a loan from the investment adviser/broker dealer.  Upon information and belief, BLMIS never charged the PJ Vehicle any margin interest for this extension of credit, effectively giving millions of dollars to the PJ Vehicle as a tax-free gift.

319.    **Strip Mall Auditor**:  The one institutional check on the IA Business's activities – the fact that it was audited by an independent auditor – was itself a major warning sign for investors.  BLMIS ostensibly had tens of billions of dollars under management, yet was audited by Friehling & Horowitz C.P.A. P.C. ("F&H"), an accounting firm with only two accountants, one of whom was semi-retired and living Florida.  The firm's offices were located in a strip mall.

320.    On November 3, 2009, David Friehling pleaded guilty to seven counts of securities fraud, investment adviser fraud, obstructing or impeding the administration of Internal Revenue laws, and making false filings with the SEC, all in connection with Madoff and BLMIS.

321.    Upon information and belief, American Securities Insiders did not independently confirm whether F&H was adequately staffed, technically equipped, or professionally qualified, or even capable of performing large scale domestic and international auditing services at a time when Madoff was reporting over $13 billion under management.  Such practices are routine for experienced and sophisticated investment managers.

322.    The size and lack of professional qualification of F&H and the nature of the services they provided were readily accessible to American Securities Insiders.  All accounting firms that perform audit work must enroll in the peer review program of the American Institute of Certified Public Accountants' ("AICPA").  This program involves the assessment by experienced auditors of a firm's audit quality.  F&H, while a member of the AICPA, had not been peer reviewed since 1993.  The firm avoided the requirement by stating, in writing, that it

did not actually perform any auditing work.  The results of these peer reviews are a matter of public record and on file with the AICPA.

323.    That BLMIS, with billions of dollars under management, relied on an auditor like F&H, should have been a red flag to American Securities Insiders.  Instead, they ignored this red flag, did not inquire further, and continued to develop their relationships with BLMIS.

324.    **Unusual Fee Structure:** BLMIS, contrary to industry standards, agreed to a compensation structure that left hundreds of millions, if not billions, of dollars on the table. BLMIS purported to be satisfied with simply earning a trading commission of four-cents per share and one dollar per option contract.  The standard investment advisory fee charged by a hedge fund manager ranges from 1% to 2% of assets under management plus a performance fee of 10% to 20% of any profits earned by the investment.  Fees normally run higher for investment advisers with a history of success.  BLMIS's unusual and suspiciously generous fee structure should have been a red flag to sophisticated investors such as American Securities Insiders.

325.    **Media:** Financial industry press reports, including a May 27, 2001 article in *Barron's* entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep mum," and a May, 2001 article in *MAR/Hedge*, a semi-monthly newsletter that is widely read by hedge fund industry professionals, entitled "Madoff Tops Charts: Skeptics Ask How," raised serious questions about the legitimacy of BLMIS and Madoff and his ability to achieve the IA Business returns he purportedly achieved using the SSC Strategy he claimed to employ.

326.    Based on these red flags, which were not consistent with a legitimate operation and/or BLMIS's purported trading activity, the American Securities Insiders knew or should have known that they and all of the PJ Account Participants were profiting from fraudulent activities in the PJ Accounts.  These red flags should have caused American Securities senior

executives Klein, Steinmann, Varet, Goldstein, Mastbaum and Nicholson, who were in a unique position to evaluate these indicia of fraud due to their investment experience, technical expertise, familiarity with due diligence protocols and access to information concerning the PJ Vehicle, to inquire further. Throughout the years that the PJ Vehicle had funds invested with BLMIS, American Securities Insiders knew the information they relied on to invest with BLMIS was insufficient. Instead, they ignored numerous red flags associated with BLMIS and continued to invest a substantial portion of the Rosenwald Family's and the PJ Account Participants' wealth with BLMIS.

## X.    AMERICAN SECURITIES INSIDERS' KNOWLEDGE AND/OR INQUIRY NOTICE MUST BE IMPUTED TO ALL DEFENDANTS

327.    Under the circumstances set forth above, the American Securities Insiders either knew, or should have known, that the returns received on behalf of the PJ Vehicle and its investors from their BLMIS investment accounts were being manipulated, and were not the product of legitimate trading activity. Despite being aware of such facts and red flags as detailed above, the American Securities Insiders failed to conduct any reasonable diligence. For the reasons set forth below, the American Securities Insiders' knowledge and/or inquiry notice must be imputed to all of the Defendants.

328.    PJ LP, later PJ LLC, was an investment vehicle made for the benefit of the Rosenwald Family and their colleagues or partners at American Securities, and their respective family members. Upon information and belief, all aspects of the Rosenwald Family Office's investments in the PJ Vehicle were overseen by the American Securities Insiders, individuals who at various points in time were employees, partners and/or executives of American Securities.

329.    Each American Securities Insider is/and or was a managing member, officer, director, or partner in PJ LP and PJ LLC and one or more of the PJ-related entities, including PJ LP, PJ LLC, PJ GP, North Peak, American Securities and the Rosenwald Family Office.

330.    The American Securities Insiders effectively dominated and controlled the PJ Vehicle and its investments, operating and directing all day-to-day decisions for the PJ Vehicle and/or advising PJ Account Participants on their investments with BLMIS.

331.    Every major decision concerning investments with BLMIS through the PJ Vehicle were made by or per the advice of the American Securities Insiders — including, in particular, decisions regarding their investments with BLMIS.  Certain American Securities Insiders, including Klein, Steinmann and Mastbaum, also determined who could invest with BLMIS through the PJ Vehicle and how PJ Participant Funds were withdrawn from BLMIS.

332.    Because the American Securities Insiders were agents of the PJ Vehicle, their knowledge and/or inquiry notice in connection with its BLMIS investments should be imputed to the PJ vehicle.  To the extent the PJ Vehicle is an alter ego of American Securities, for the reasons set forth above, the American Securities Insiders were agents of American Securities and their knowledge concerning the PJ Vehicle investments with BLMIS are imputed to American Securities.

333.    Agency principles similarly require the imputation of the American Securities Insiders' knowledge and/or inquiry notice to the PJ Account Participants.

334.    The PJ Account Participants authorized the American Securities Insiders to act as their agents in allowing them to invest with BLMIS and in administering and/or otherwise managing their BLMIS investments.  Upon information and belief, PJ Account Participants also invested through the PJ Vehicle upon the advice of certain American Securities Insiders

including Nicholson, Klein, Steinmann and Varet.  All actions undertaken by any American Securities Insider for each of the PJ Account Participants' BLMIS investments fell within the scope of the American Securities Insiders' responsibilities.  The facts giving rise to the American Securities Insiders' knowledge and/or inquiry notice in connection with BLMIS were acquired within the scope of this agency relationship.

335.    The BLMIS transfers made to and from the PJ Vehicle were made for the benefit of the PJ Account Participants.

336.    Accordingly, under principles of agency, the American Securities Insiders' knowledge and/or inquiry notice must be imputed to the defendant PJ Account Participants.

## XI.    THE TRANSFERS

337.    According to BLMIS's records, accounts No. 1KW172 and No. 1KW387 were maintained with BLMIS, as set forth in Exhibit B.  Upon information and belief, for each Account, a Customer Agreement, an Option Agreement, and/or a Trading Authorization Limited to Purchases and Sales of Securities and Options (collectively, the "Account Agreements") were executed and delivered to BLMIS at its headquarters either at 110 Wall Street, New York, New York, or later at 885 Third Avenue, New York, New York.

338.    The Account Agreements were to be performed in New York, New York through securities trading activities that were to take place in New York, New York.  The PJ Accounts were held in New York, New York, and the PJ Vehicle sent funds to BLMIS and/or the BLMIS Bank Account in New York, New York for application to the PJ Accounts and the conducting of trading activities.  Between when the PJ Accounts were opened and the Filing Date, the PJ Vehicle made deposits to BLMIS through checks and/or wire transfers into the BLMIS Bank Account and/or was the recipient of inter-account transfers between its BLMIS accounts.

339.    Between September 1996 and the Filing Date, the PJ Vehicle invested $81,793,843 with BLMIS directly into the BLMIS Bank Account.  The BLMIS Bank Account was maintained at a JPMorgan Chase & Co. branch in New York, New York.

340.    Prior to the Filing Date, BLMIS made Initial Transfers to the PJ Vehicle.  The Initial Transfers were ultimately made for the benefit of the PJ Account Participants and include, but are not limited to, the Initial Transfers listed in Exhibit C.

341.    From January 1, 2000 to the Filing Date, BLMIS made Initial Transfers directly to the Initial Transferee Defendants totaling at least $91,896,296.  Under the circumstances set forth above, since at least January 1, 2000, the Initial Transferee Defendants knew or should have known of fraudulent activity at BLMIS and/or that the Initial Transfers were made for a fraudulent purpose.  Of the Initial Transfers, $10,102,453 constituted non-existent profits supposedly earned in the PJ Accounts (the "Fictitious Profits").  The Fictitious Profits received by the PJ Vehicle were other people's money.  The Initial Transfers were directly or indirectly made to the PJ Vehicle and include, but are not limited to, the Initial Transfers listed in Columns 11, 12 and 13 of the schedules attached as Exhibit C.

342.    The Transfers are avoidable and recoverable under sections 544, 548, 550(a) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3), and applicable provisions of N.Y. C.P.L.R. 203(g) and 213(8) (McKinney 2001) and DCL sections 273-279 (McKinney 2001).

343.    Of the Initial Transfers, BLMIS made payments to the Initial Transferee Defendants of at least $59,441,296 during the six years prior to the Filing Date (the "Six Year Transfers"), which are avoidable and recoverable under sections 544, 550(a) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3), and

applicable provisions of DCL sections 273 – 279.  Of these Six Year Transfers, $10,102,453 constituted non-existent profits supposedly earned in the Accounts (the "Six Year Fictitious Profits") and $49,338,843 constituted the return of "principal."  The Six Year Fictitious Profits received by the Initial Transferee Defendants were other people's money.  The Six Year Transfers include, but are not limited to, the Six Year Transfers listed in Columns 8, 9 and 10 of the schedules attached as Exhibit C.

344.    Of the Six Year Transfers, BLMIS made payments to the PJ Vehicle of at least $31,146,000 during the two years prior to the Filing Date (the "Two Year Transfers"), which are avoidable and recoverable under sections 548, 550(a) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).  Of these Two Year Transfers, $10,102,157 constituted non-existent profits supposedly earned in the PJ Accounts (the "Two Year Fictitious Profits") and $21,043,843 constituted the return of "principal."  The Two Year Fictitious Profits received by the Initial Transferee Defendants were other people's money.  The Two Year Transfers include, but are not limited to, the Two Year Transfers listed in Columns 5, 6 and 7 of the schedules attached as Exhibit C.

345.    Upon information and belief, most, if not all, of the $91,896,296 of the Initial Transfers were subsequently transferred by the Initial Transferee Defendants to the Subsequent Transferee Defendants.

346.    The Subsequent Transfers, or the value thereof, are recoverable from Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code.

347.    To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

348.    The Trustee's investigation is ongoing and the Trustee reserves the right to (i) supplement the information regarding the Initial Transfers, the Subsequent Transfers, and any additional transfers, and (ii) seek recovery of such additional transfers.

## XII.    CUSTOMER CLAIM

349.    On December 23, 2008, this Court entered an Order on Application for Entry of an Order Approving Form and Manner of Publication and Mailing of Notices, Specifying Procedures for Filing, Determination and Adjudication of Claims, and Providing Other Relief ("Claims Procedures Order"; Docket No. 12).    The Claims Procedures Order specifies the procedure for the filing of customer claims, under which claimants had until July 2, 2009 to file a timely claim.    According to the Claims Procedures Order, the Trustee was to notify such claimant by mail of his determination of the claim.    To date, the Trustee has determined 16,516 of the 16,518 total claims filed in this case.    If the claimant desired to oppose the determination, the claimant was required to file with this Court a written statement setting forth the basis for the opposition within (30) thirty days of the date on which the Trustee mailed his determination to the claimant.    If the claimant failed to file an opposition as required, the Trustee's determination was deemed approved by the Court and binding on the claimant.    The Claims Procedures Order further provides that in the event an objection to the Trustee's determination is timely filed (the "Objection"), the Trustee is to obtain a date and time for a hearing before this Court on the controverted claim and shall notify the claimant in writing of the date, time and place of hearing.

350.    On or about February 2, 2009, PJ LLC filed a customer claim with the Trustee, Account 1KW387, which  was designated as Claim #004925 (the "Customer Claim").    On October 5, 2010, the Trustee issued a Notice of Trustee's Determination of Claim to PJ LLC with respect to the Customer Claim (Exhibit D) denying PJ LLC's Customer Claim because PJ LLC withdrew more money from its account than was deposited with BLMIS for the purchase of

securities.  The Trustee granted PJ LLC an extension to file its Objection from the original deadline of November 4, 2010 until March 28, 2011, and PJ LLC filed its Objection dated as of March 28, 2011, which was filed with this Court on March 30, 2011 [Docket No. 4000].

## COUNT ONE:
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551

### *(Initial Transferee Defendants)*

351.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

352.    Each of the Two Year Transfers was made on or within two years before the Filing Date of BLMIS's case.

353.    Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

354.    Each of the Two Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then existing or future creditors.

355.    Each of the Two Year Transfers constitute a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the PJ Vehicle and American Securities pursuant to section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-(2)(c)(3).

356.    As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Initial Transferee Defendants: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS.

## COUNT TWO:
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B), 550(a), AND 551

### *(Initial Transferee Defendants)*

357.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

358.    Each of the Two Year Transfers was made on or within two years before the Filing Date.

359.    Each of the Two Year Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of sections 101(54) and 548(a) of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

360.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Transfers.

361.    At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfers in question.

362.    At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

363.    At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS's ability to pay as such debts matured.

364.    Each of the Two Year Transfers constitute fraudulent transfers avoidable by the Trustee pursuant to § 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Initial Transferee Defendants pursuant to section 550(a) and 15 U.S.C. § 78fff-(2)(c)(3).

365.    As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment against the Initial Transferee Defendants: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS.

**COUNT THREE:**
**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 276, 276-a 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**

***(Initial Transferee Defendants)***

366.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

367.    At all times relevant to the Six Year Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

368.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

369.    Each of the Six Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to or for the benefit of the Initial Transferee Defendants in furtherance of a fraudulent investment scheme.

370.    Each of the Six Year Transfers were received by the Initial Transferee Defendants with actual intent to hinder, delay or defraud creditors and/or future creditors of BLMIS at the time of each of the Initial Transfers.

371.    As a result of the foregoing, pursuant to DCL sections 276, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the

Trustee is entitled to a judgment against the Initial Transferee Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Initial Transferee Defendants and American Securities Insiders.

**COUNT FOUR:**
**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**

*(Initial Transferee Defendants)*

372.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Amended Complaint as if fully rewritten herein.

373.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e) of the Bankruptcy Code.

374.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

375.    BLMIS did not receive fair consideration for the Six Year Transfers.

376.    BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six Year Transfers.

377.    As a result of the foregoing, pursuant to DCL sections 273, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Initial Transferee Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c)

recovering the Six Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS.

<u>**COUNT FIVE:**</u>
<u>**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW**</u>
<u>**§§ 274, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**</u>

***(Initial Transferee Defendants)***

378.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Amended Complaint as if fully rewritten herein.

379.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under § 502(e) of the Bankruptcy Code.

380.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

381.    BLMIS did not receive fair consideration for the Six Year Transfers.

382.    At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Transfers was an unreasonably small capital.

383.    As a result of the foregoing, pursuant to DCL sections 274, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Initial Transferee Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS

## COUNT SIX:
## FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

### *(Initial Transferee Defendants)*

384.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Amended Complaint as if fully rewritten herein.

385.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

386.    Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

387.    BLMIS did not receive fair consideration for the Six Year Transfers.

388.    At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

389.    As a result of the foregoing, pursuant to DCL sections 275, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Initial Transferee Defendants: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS.

## COUNT SEVEN:
### RECOVERY OF ALL FRAUDULENT TRANSFERS – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g), 213(8) AND NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, 11 U.S.C. §§ 544, 550(a), AND 551

*(Defendants)*

390.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

391.    At all times relevant to the Initial Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

392.    At all times relevant to the Initial Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

393.    Each of the transfers prior to the six years before the Filing Date constituted a conveyance by BLMIS as defined under DCL section 270.

394.    Each of the Initial Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Initial Transfers to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

395.    Each of the Initial Transfers was received by the Initial Transferee Defendants with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the Initial Transfers, and/or future creditors of BLMIS.

396.    As a result of the foregoing, pursuant to N.Y. C.P.L.R. 203(g), 213(8), DCL sections 276, 276-a, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Defendants: (a) avoiding and preserving the Initial Transfers, (b) directing that the Initial Transfers be set aside,

(c) recovering the Initial Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendants and American Securities Insiders.

## COUNT EIGHT:
## RECOVERY OF SUBSEQUENT TRANSFERS – 11 U.S.C. §§ 550(a) AND 551

### *(Subsequent Transferee Defendants)*

397.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

398.    Each of the Initial Transfers are avoidable under sections 544 and 548 of the Bankruptcy Code, DCL sections 273, 274, 275 and/or 276 and 15 U.S.C. § 78fff-2(c)(3).

399.    On information and belief, some or all of the $91,896,296 of the Initial Transfers were subsequently transferred by the PJ Vehicle directly or indirectly to the Subsequent Transferee Defendants (*see* Exhibit A) in the form of transfers from one account to another or other means (as defined earlier, the "Subsequent Transfers").

400.    Each of the Subsequent Transfers was made directly or indirectly to, or for the benefit of, the Subsequent Transferee Defendants.

401.    Subsequent Transferee Defendants are immediate or mediate transferees of the Subsequent Transfers from the PJ Vehicle.

402.    As a result of the foregoing, pursuant to DCL sections 278 and/or 279, sections 550(a) and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Subsequent Transferee Defendants recovering the Subsequent Transfers, or the value thereof, for the benefit of the estate of BLMIS from the Subsequent Transferee Defendants.

## COUNT NINE:
## DISALLOWANCE OF PJ LLC's CUSTOMER CLAIM

### *(PJ LLC)*

403.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Amended Complaint as if fully rewritten herein.

404.    PJ LLC filed Customer Claim #4925.

405.    Such Customer Claim should not be allowed pursuant to section 502(d) of the Bankruptcy Code, because PJ LLC, the entity that filed the Customer Claim, is the recipient of Initial Transfers of BLMIS's property, which are avoidable and recoverable under sections 544, 548 and/or 550(a) of the Bankruptcy Code, DCL sections 273, 274, 275 and 276 and § 78fff-2(c)(3) as set forth above, and PJ LLC has not returned the Initial Transfers to the Trustee.

406.    The Claims Procedures Order includes a process for determination and allowance of claims under which the Trustee has been operating.  As a result of the foregoing, the Trustee has denied PJ LLC's claim on its PJ Account No. 1KW387.  PJ LLC filed its Objection to the Trustee's denial, dated March 28, 2011, which was filed with this Court on March 30, 2011 [Docket No. 4000].

407.    **WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Initial Transferee Defendants and Subsequent Transferee Defendants as follows:

i.    On the First Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a) and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3): (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS;

ii.      On the Second Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a) and 551 of the Bankruptcy Code: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS;

iii.      On the Third Claim for Relief, pursuant to DCL sections 276, 276-a, 278 and/or 279, sections 544(b), 550(a) and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3): (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, (c) recovering the Six Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Initial Transferee Defendants and American Securities Insiders;

iv.      On the Fourth Claim for Relief, pursuant to DCL sections 273, 278 and/or 279, sections 544(b), 550 and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3): (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS;

v.      On the Fifth Claim for Relief, pursuant to DCL sections 274, 278 and/or 279, sections 544(b), 550 and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3): (a) avoiding and preserving the Six Year Fraudulent Transfers, (b) directing the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS;

vi.      On the Sixth Claim for Relief, pursuant to DCL sections 275, 278 and/or 279, sections 544(b), 550 and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3): (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and

(c) recovering the Six Year Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS;

vii.    On the Seventh Claim for Relief, pursuant to N.Y. C.P.L.R. 203(g) and 213(8), DCL sections 276, 276-a, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3): (a) avoiding and preserving the Initial Transfers, (b) directing that the Initial Transfers be set aside, (c) recovering the Initial Transfers, or the value thereof, from the Initial Transferee Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Initial Transferee Defendants and American Securities Insiders.

viii.    On the Eighth Claim for Relief, as a result of the avoidability of the Initial Transfers pursuant to DCL sections 273-279, sections 544 and 548 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), recovering the Subsequent Transfers, or the value thereof, from Subsequent Transferee Defendants pursuant to section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3);

ix.    On the Ninth Claim for Relief, that the Customer Claim of Defendant PJ LLC should be disallowed pursuant to section 502(d) of the Bankruptcy Code unless and until the Initial Transfers are paid;

x.    On all Claims for Relief, pursuant to federal common law and N.Y. C.P.L.R. 5001 and 5004, awarding the Trustee prejudgment interest from the date on which the Initial Transfers were received;

xi.    On all Claims for Relief, establishment of a constructive trust over the proceeds of the Initial Transfers in favor of the Trustee of the benefit of the estate of BLMIS;

xii.    On all Claims for Relief, assignment of any of the Defendants' income tax refunds from the United States, state and local governments paid on fictitious profits during the course of the scheme;

xiii.    Awarding the Trustee all applicable interest, costs and disbursements of this action; and

xiv.    Granting the Trustee such other, further and different relief as the Court deems just, proper and equitable.

Dated:  New York
       September 9, 2011

By: _/s/ Fernando A. Bohorquez, Jr.___

**BAKER & HOSTETLER, L.L.P.**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Fernando A. Bohorquez, Jr.
Email: fbohorquez@bakerlaw.com
Jonathan B. New
Email: jnew@bakerlaw.com
Keith R. Murphy
Email:kmurphy@bakerlaw.com
Geraldine E. Ponto
Email: gponto@bakerlaw.com
Kathryn M. Heim
Email: kheim@bakerlaw.com

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment
Securities LLC and Bernard L. Madoff*